559 So.2d 227 (1989)
Willie J. HIGH and Florida Power & Light Company, Appellants,
v.
WESTINGHOUSE ELECTRIC CORPORATION, Appellee.
No. 88-202.
District Court of Appeal of Florida, Third District.
December 12, 1989.
As Corrected on Denial of Rehearing and Rehearing April 24, 1990.
Sinclair, Louis, Siegel, Heath, Nussbaum & Zavertnik and Frank Nussbaum and Paul A. Louis, Miami, for appellant High.
Coll, Davidson, Carter, Smith, Salter & Barkett and Norman A. Coll, Miami, for appellant Florida Power & Light Co.
Kimbrell & Hamann and Paul L. Nettleton and R. Benjamine Reid, Miami, for appellee.
Before NESBITT and FERGUSON, JJ., and VANN, Harold R., Associate Judge.
As Corrected on Denial of Rehearing and Rehearing En Banc April 24, 1990.
NESBITT, Judge.
Willie J. High, a seventeen-year employee of Peppers' Steel and Alloys, Inc., alleged that he had been injured, on the job, by exposure to hazardous PCB's (polychlorinated biphenyls) in the transformer fluid contained within "junk transformers" which he handled, dismantled and helped process as part of his job. High sued Westinghouse, the transformer manufacturer, under theories of strict liability and negligence. The trial court granted Westinghouse's motion for summary judgment, adopting the rationale expressed in Kalik v. Allis-Chalmers Corp., 658 F. Supp. 631 (W.D.Pa. 1987), Johnson v. Murph Metals, Inc., 562 F. Supp. 246 (N.D.Tex. 1983), and Wingett v. Teledyne Indus., Inc., 479 N.E.2d 51 (Ind. 1985), finding those decisions consistent with Florida law regarding section 402A of the Restatement (Second) of Torts as adopted in West v. Caterpillar *228 Tractor Co., 336 So.2d 80 (Fla. 1976).[1] We agree.
Westinghouse Electric Corporation sold electrical transformers to Florida Power & Light Company (FP & L). When the devices became too old to be of further use to FP & L, it disposed of the transformers by selling them to Pepper's, a scrap metal salvage business. In order to recover valuable metals located inside the transformers for resale, it was Pepper's procedure to dismantle the transformers and dump the dielectric fluid contained in them on the ground. High alleged his injury occurred during this process.
Liability exists under section 402A for a negligent failure to warn only if there is a use of the product reasonably foreseeable to the manufacturer. The dismantling and recycling of products after they have been destroyed have been held to be product uses not reasonably foreseeable to manufacturers. See Kalik, 658 F. Supp. at 635 (scrap metal business's dismantling and processing of junk electrical components originally manufactured by defendant was not "reasonably foreseeable" use of components, so that defendant was not liable when PCB's in components combusted to produce highly toxic dioxins which contaminated business's land); Johnson, 562 F. Supp. at 249 (the creation of dangerous gases due to the smelting of battery scrap metal cannot be viewed as a foreseeable "use" of a defendant's automotive batteries); Wingett, 479 N.E.2d at 56 (a manufacturer's potential liability for products placed in the stream of commerce does not extend to the demolition of the product).
Although courts in Florida have yet to address this precise issue, there appears to be no reason to reach a contrary result in the present case. Westinghouse's transformers were destroyed prior to the alleged injuries. While the transformers were sealed and intact there was no harm. Rather, the alleged damage occurred after the contents of the devices were exposed through the dismantling process. Westinghouse's product as it had originally been sold to FP & L, for practical purposes, had ceased to exist at the time the alleged injuries occurred.
Here, the determination of no liability is based upon a substantial change in the product from the time it left the manufacturer's control to the time of the subject incident; this change negates the manufacturer's liability for any alleged defect under 402A. Cf. Martinez v. Clark Equip. Co., 382 So.2d 878 (Fla. 3d DCA 1980) (changes and repairs to forklift were held not to be substantial changes for the purpose of determining strict liability of manufacturer to injured forklift operator).
Where it is undisputed that a product defect has been created by subsequent alteration (i.e., destruction) and not by the actions of the manufacturer, the manufacturer is properly exonerated of liability as a matter of law. See Foecker v. Allis-Chalmers, 366 F. Supp. 1352 (E.D.Pa. 1973) (manufacturer of electrical switchboard entitled to summary judgment as a matter of law since there was no genuine issue of material fact relative to the proximate causation of the injury to steelworker because the injury was caused not by defective design of the product but by the altering of the circuitry done by plaintiff's employer). See generally, Annotation, Products Liability: Alteration of Product After it Leaves Hands of Manufacturer or Seller as Affecting *229 Liability for Product  Caused Harm, 41 A.L.R.3d 1251 (1972).
A 1976 letter from Westinghouse to FP & L does not affect this analysis. That letter advised that 1) some transformers might contain PCB's; 2) a number of states had recently enacted legislation providing for special reporting, labelling and/or disposition of PCB's; and 3) when repairing, maintaining, or disposing of transformers, they should be checked for the presence of PCB's. Through the letter, Westinghouse did not assume liability for a transformer once its useful life was over and it had become a scrap item. Rather Westinghouse was acting in a responsible corporate fashion to inform its ultimate consumer, FP & L, of potentially important product information.
We find that the decisions cited by the trial court in its order in this case provide a persuasive basis for concluding that the actual products supplied by Westinghouse were the electrical transformers, not the contaminated dielectric fluid. As a matter of law, the unsealing, stripping, and dumping of the contents of Westinghouse's product in order to salvage junk components were not reasonably foreseeable "uses" of the product nor was Willie High an intended "user" within the meaning of section 402A.[2]
Accordingly, the summary judgment in favor of Westinghouse is affirmed.
NESBITT, J., and VANN, Harold R., Associate Judge, concur.
FERGUSON, Judge (dissenting).
The parties agree that this case is one of first impression in the state.[1] The narrow question presented is whether a manufacturer's duty to protect against injuries caused by its product terminates, as a matter of law, with the product's intended useful life  to the exclusion of salvage operations. There is little authority directly on point in this developing area of the law.
In 1983, the appellant, Willie High, a 17-year employee of defendant, Pepper's Steel and Alloys, Inc., and one of several employees involved in Pepper's transformer salvage operations, instituted this lawsuit claiming injuries from direct contact with toxic transformer oils. Defendant, Westinghouse Electric Corp., a transformer manufacturer, argued that High was not a consumer of its product, consistent with the product's intended use, and that since salvage of the product after its useful life was not foreseeable, no duty was owed to him.
This appeal is brought from a summary judgment entered in favor of Westinghouse, on High's negligence and strict liability claims.[2] In granting the defendant's motion, the trial court relied on Kalik v. Allis-Chalmers Corp., 658 F. Supp. 631 (W.D.Pa. 1987); Johnson v. Murph Metals, Inc., 562 F. Supp. 246 (N.D.Tex. 1983), and Wingett v. Teledyne Indus., Inc., 479 N.E.2d 51 (Ind. 1985), cases holding generally that a manufacturer's potential liability for a product placed in the stream of commerce does not extend to the demolition or dismantling process after the product's life, as intended, has expired.
The additional facts, as material to this appeal, considered in a light most favorable to the nonmovant for summary judgment, Weinstein v. General Acc. Fire & Life Assur. Co., 141 So.2d 318 (Fla. 1st DCA 1962); Warring v. Winn-Dixie Stores, 105 So.2d 915 (Fla. 3d DCA 1958), follow.
*230 Westinghouse manufactures electrical transformers. Florida Power & Light (FP & L), also a defendant, purchases transformers from Westinghouse  and other manufacturers  which are used to regulate voltage through power lines. It is undisputed that transformers have a very long useful life and when taken out of service are customarily sold for salvage. FP & L disposed of its old transformers by selling them to Pepper's, a scrap metal salvage business.[3] Pepper's, in the course of its salvage operations, routinely opened the sealed transformers in order to recover their valuable copper and aluminum cores. Dielectric fluid or coolant oil in the transformers[4]  containing hazardous polychlorinated biphenyls (PCB's)  was removed in order to reach the metals. The toxic oils were dumped on the open ground at Pepper's place of business.[5] Significant traces of PCB contaminants were found on the grounds of the salvage site, and in underground waters, by county, state, and federal inspectors.
High contends that the cases relied upon by the trial court are factually distinguishable, and even if they are not, the rationale of those cases has been rejected in Florida as a matter of sound public policy.[6] The doctrine of strict liability in tort, as expressed in section 402A Restatement (Second) of Torts, was adopted in Florida in 1976. West v. Caterpillar Contractor Co., Inc., 336 So.2d 80 (Fla. 1976). The Florida supreme court broadly defined the scope of those who may recover for injuries caused by a product rendered dangerous by reason of a manufacturing defect:
The public policy which protects the user and the consumer of a manufactured article should also protect the innocent by-stander. Of course, the duty of a manufacturer for breach of which liability will attach runs only to those who suffer personal injury or property damage as the result of using or being within the vicinity of the use of the dangerous instrumentality furnished by a manufacturer which fails to give notice of the danger.
In general, whether a plaintiff's use of a product was reasonably foreseeable to the *231 manufacturer raises a question of fact. Kalik v. Allis-Chalmers Corp. at 635; Wingett v. Teledyne Indus., Inc. at 54. There is evidence in the record from which a jury may conclude that salvage activities, necessitating dismantling of the transformers, were, or should have been, reasonably foreseen by the manufacturer. A 1976 letter from Westinghouse to FP & L warned:
As a result of recent investigations, we have determined that some oil-filled transformers may contain varying concentrations of PCB's... .
Currently there are no nationally established standards for allowable levels of PCB's in oil for closed electrical systems. A number of states have recently enacted legislation providing for special reporting, labelling, and/or disposition of PCB's. Because legislation varies in different states it is suggested that customers institute any special procedures which may be required for conformance. In addition, when performing repair, routine maintenance or disposal, oil-filled transformers should be checked for the presence of PCBs... .

(Emphasis added). It is clear from other communications in the record that Westinghouse and FP & L were concerned, within their corporate hierarchies, about the PCB dilemma and their potential liability for resultant harm. It is not established conclusively, however, that Westinghouse shared that information in a timely fashion so as to constitute an adequate warning, or that High failed to exercise ordinary due care.
There is no public policy in this state  nor is there a demonstrated need for one  which insulates a manufacturer of a hazardous product from liability for damages merely because the useful life of the product has ended, where a person, without knowledge of the danger, suffers injury from an otherwise foreseeable use of the product. In fact, the public policy expressed in West v. Caterpillar Tractor Co., is to the contrary. The remaining arguments made by the defendant as grounds for affirming the summary judgment, i.e., causation in fact, are, on the record in this case, questions for the fact-finder. Banat v. Armando, 430 So.2d 503 (Fla. 3d DCA 1983), rev. denied, 446 So.2d 99 (Fla. 1984).
I would reverse the summary judgment and remand for further proceedings.
NOTES
[1] Section 402A of the Restatement (Second) of Torts (1965) states as follows:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although:
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
(emphasis added).
[2] We certify to the Supreme Court of Florida that the within question passes upon one of great public importance within the meaning of article V, section 3(b)(4), Florida Constitution.
[1] No judgment adverse to FP & L, one of several defendants in the pending action, has yet been entered. FP & L has joined in this appeal pursuant to Florida Rule of Appellant Procedure 9.360(a), in order to preserve its contribution claim against Westinghouse. See Holton v. H.J. Wilson Co., Inc., 482 So.2d 341 (Fla. 1986).
[2] No appeal is taken from interlocutory orders dismissing other counts of the complaint based on theories of breach of implied warranty of merchantability and breach of implied warranty of fitness for particular purpose. See Westinghouse Corp. v. Ruiz, 537 So.2d 596 (Fla. 3d DCA 1988) (doctrine of strict liability in torts supplants all no-privity breach of implied warranty cases). The action continues against FP & L and Pepper's.
[3] On December 8, 1977, FP & L and Pepper's signed a written "Junk Transformer Agreement" effective through 1980. James Killingsworth, director of procurement and materials management for FP & L, testified, by deposition, that during this period, approximately 27,000 transformers were sold to Pepper's. A second agreement extended the relationship through 1982.
[4] The dielectric fluid or oils containing PCB's were purchased from Monsanto Corporation. In early 1970 Monsanto notified transformer manufacturers, including Westinghouse, of the dangerous, toxic propensities of the PCB's used in electrical transformers. The record contains a Letter and Indemnity Agreement dated January 15, 1972, between Monsanto and Westinghouse, obligating Monsanto to pay for damages which Westinghouse might be required to pay in the event of any injury caused by the PCB's.
[5] From about 1967 to 1977, FP & L shipped oil-filled transformers to Pepper's. It is disputed whether, after 1977, FP & L drained all the oil from the transformers before shipping them to Pepper's.
[6] In Kalik the complaint against General Electric was dismissed for failure to state a claim based on allegations that the products involved were junk electrical components. The court held that the complaint suggested that GE's product had been substantially changed, thereby, precluding liability under section 402A Restatement (Second) of Torts.

Similarly, in Johnson, it was held that the plaintiff was not a user of the defendant-manufacturer's product where the original product had been destroyed and recycled, through a lead smelting process, to form a different product.
The court's holding in Wingett, "that a manufacturer's potential liability for products placed in the stream of commerce does not extend to the demolition of the product," went far beyond the issues presented by the facts. The plaintiff sustained injuries in a fall from ductwork he was sitting on in the process of removing the same ductwork. On the way to its holding, the court rejected the allegation, made in support of the strict liability claim, that the defendant manufactured and installed a product with a dangerous hidden defect.
The Wingett court held that "[l]iability will be attributed to the manufacturer only if the product contains a defective condition rendering it unreasonably dangerous for its intended use" and that sitting on the ductwork to cut its support hangers, in the course of dismantling the product, was not a reasonably foreseeable use as a matter of law. This case, unlike Wingett, involves a dangerous product. Further, it cannot be said, as a matter of law, that the subject salvage operation, undertaken to save valuable parts of the discarded product for further use, was an unforeseeable use of the transformers.