610 So.2d 1259 (1992)
Willie J. HIGH, et al., Petitioners,
v.
WESTINGHOUSE ELECTRIC CORP., et al., Respondents.
No. 75991.
Supreme Court of Florida.
June 11, 1992.
Rehearing Denied January 7, 1993.
Rehearing Stricken February 5, 1993.
Paul A. Louis and Frank Nussbaum of Sinclair, Louis, Siegel, Heath, Nussbaum & Zavertnik, P.A., Miami, on behalf of Willie High, and Norman A. Coll of Coll, Davidson, Carter, Smith, Salter & Barkett, P.A., Miami, on behalf of Florida Power & Light Co., for petitioners.
R. Benjamine Reid and Paul L. Nettleton of Popham, Haik, Schnobrich & Kaufman, Ltd., Miami, for respondents.
John W. Wilcox and J. Douglas Baldridge of Rudnick & Wolfe, Tampa, amicus curiae for Thomas Curtis, William U. Payne, Flora Payne and Lowell Payne.
*1260 OVERTON, Justice.
We have for review High v. Westinghouse Electric Corp., 559 So.2d 227 (Fla. 3d DCA 1989), in which the district court affirmed the trial court summary judgment, holding that Westinghouse, as the manufacturer of electrical transformers, is not liable to an employee of a scrap metal salvage business for injuries allegedly sustained from a hazardous fluid that was released in dismantling transformers in the scrapping process. The district court then certified that "the within question passes upon one of great public importance within the meaning of article V, section 3(b)(4), Florida Constitution." Id. at 229 n. 2.[1] While we approve the district court's decision on the question of strict liability, we find that there remains an issue of fact on the question of negligence. Consequently, we quash in part the decision of the district court of appeal and remand this case for further proceedings.
The relevant facts in the record are as follows. Westinghouse manufactured electrical transformers and sold them to Florida Power and Light Company (FPL). From 1967 to 1983, FPL sold its electrical transformers for junk to Pepper's Steel and Alloys (Pepper's), a scrap metal salvage business. To manufacture the electrical transformers sold to FPL, Westinghouse purchased products from Monsanto, a manufacturer of polychlorinated biphenyls (PCBs). In a January 15, 1972, letter and indemnification agreement from Westinghouse to Monsanto, Westinghouse acknowledged that Monsanto had notified Westinghouse that the PCBs used in its products tended to persist in the environment; that care was required in their handling, possession, use, and disposition; and that tolerance limits had been or were being established for PCBs in various food products.[2] In 1976, Westinghouse wrote a letter to its utility company customers, including FPL, disclosing the potential existence of PCBs in their transformers. In that letter, Westinghouse informed them that some oil-filled transformers had been contaminated with PCBs in the manufacturing process. Westinghouse's letter suggested that when performing repairs, routine maintenance, or disposal, all oil-filled transformers should be checked for the presence of PCBs.[3]
Studies of humans exposed to PCBs have shown numerous adverse effects, including but not limited to chloracne and other epidermal disorders, digestive disturbances, jaundice, impotence, throat and respiratory irritations, and severe headaches. It is undisputed that none of the junk transformers that FPL sold to Pepper's contained any labels, markings, or warnings of any kind that the transformers contained PCBs or that the contents might be hazardous to human health.
Willie J. High was the main truck driver for Pepper's from 1965 to 1983. As part of his duties, he picked up aluminum wire, cable, and other scrap metal. He also picked up transformers from FPL in Miami and other cities around Florida. As part of his job, High loaded and unloaded the transformers onto Pepper's truck with a forklift. Specifically, he hooked and unhooked the forklift cables. During this *1261 process, he came into contact with the PCB-contaminated transformer oil.
In 1975, the Dade County Department of Environmental Resource Management (DERM) cited Pepper's for a number of environmental ordinance violations. In 1983, DERM, the State of Florida Environmental Regulation Department, and the Environmental Protection Agency (EPA) determined that Pepper's property was sufficiently contaminated with oil containing PCBs to justify commencement of federal, state, and county legal actions against FPL, Pepper's, and the owners of adjacent properties for violating county, state, and federal ordinances and laws and to demand a cleanup of the site by FPL. As a result of the media coverage given the DERM and EPA actions, High became aware that he had been exposed to PCBs while employed at Pepper's and that some of his physical and mental problems might be attributed to this exposure. Consequently, on July 9, 1983, High brought this action under strict liability and negligence theories.
The trial court granted Westinghouse's motion for summary judgment, holding as a matter of law that the ultimate disposal of the transformer was not foreseeable to the manufacturer as a reasonably intended "use." On appeal, the district court of appeal, in a split decision, affirmed. In explaining why strict liability under section 402A of the Restatement (Second) of Torts (1965) is not applicable, the district court stated:
The dismantling and recycling of products after they have been destroyed have been held to be product uses not reasonably foreseeable to manufacturers... .
... Westinghouse's transformers were destroyed prior to the alleged injuries. While the transformers were sealed and intact there was no harm. Rather, the alleged damage occurred after the contents of the devices were exposed through the dismantling process. Westinghouse's product as it had originally been sold to FP & L, for practical purposes, had ceased to exist at the time the alleged injuries occurred.
Here, the determination of no liability is based upon a substantial change in the product from the time it left the manufacturer's control to the time of the subject incident; this change negates the manufacturer's liability for any alleged defect under 402A... .
Where it is undisputed that a product defect has been created by subsequent alteration (i.e., destruction) and not by the actions of the manufacturer, the manufacturer is properly exonerated of liability as a matter of law.
559 So.2d at 228. The district court concluded that
the actual products supplied by Westinghouse were the electrical transformers, not the contaminated dielectric fluid. As a matter of law, the unsealing, stripping, and dumping of the contents of Westinghouse's product in order to salvage junk components were not reasonably foreseeable "uses" of the product nor was Willie High an intended "user" within the meaning of section 402A.
Id. at 229.
There are two questions we must address. The first is whether strict liability applies under section 402A of the Restatement (Second) of Torts for injuries that occur in dismantling an item. The second is whether the manufacturer, Westinghouse, in this instance was negligent in failing to timely warn of dangerous contents in its product that could cause injuries in its alteration and dismantling.
While these are questions of first impression in this state, other courts have addressed similar issues. In Kalik v. Allis-Chalmers Corp., 658 F. Supp. 631 (W.D.Pa. 1987), the owners of a scrap metal business that had been contaminated by PCBs sued the manufacturers and suppliers of the products containing the PCBs to recover cleanup costs and damages incurred under the Comprehensive Environmental Response Compensation and Liability Act of 1980. In that case, the scrap metal business had purchased junk electrical components as scrap. The electrical components contained, as they did in this instance, PCBs. During the course of dismantling, *1262 handling, and storing the junk electrical components, PCB-contaminated oil leaked or spilled onto the site. A furnace used in dismantling and processing the components caused PCBs in the components to allegedly produce dioxins, which also polluted the site. Plaintiff's damage claims were based upon a negligent failure to warn and strict liability in tort. The United States District Court in Pennsylvania considered whether plaintiff's use of the product was reasonably foreseeable to the manufacturer. Although the court agreed that this was ordinarily a question of fact, it held as a matter of law that the recycling of a product after it had been destroyed and the destruction of a product were not reasonably foreseeable uses to the manufacturer.
In Wingett v. Teledyne Industries, Inc., 479 N.E.2d 51 (Ind. 1985), overruled on other grounds by Douglass v. Irvin, 549 N.E.2d 368 (Ind. 1990), an employee of an independent contractor hired to remove ductwork in a foundry was injured when a connection between two segments of ductwork failed and a portion of the ductwork fell to the floor as the employee cut the support hangers. The employee sued the foundry owners and the manufacturer and the installer of the ductwork. The employee claimed that the connection between the segments of ductwork that failed, consisting of a sheet metal band, screws, and clamps instead of an iron collar and bolts found on the other segments, caused his injury. The Indiana Supreme Court affirmed the summary judgement in favor of the manufacturer, holding as a matter of law that the dismantling and demolishing of the ductwork was not a reasonably foreseeable "use" of the product.
Finally, in Johnson v. Murph Metals, Inc., 562 F. Supp. 246 (N.D.Tex. 1983), a United States District Court in Texas granted a summary judgment and held that fumes and particulates from smelting lead from scrap batteries were not created from a "use" of the batteries. In that case, the employees of various lead-smelting companies who had sued certain automotive battery manufacturers stipulated that their injuries did not result from working with intact batteries or from the destruction of batteries to obtain the lead for smelting. The lead fumes and dust that allegedly injured them were created only after the lead was extracted from the destroyed batteries and used in the smelting process. In determining that the plaintiffs were not "users" of defendants' products, the court held that "the defendants' product had ceased to exist." Id. at 249.
With regard to the first question and the applicability of strict liability under section 402A of the Restatement (Second) of Torts, we find that strict liability is not applicable. Florida adopted the principles of strict liability in tort under section 402A of the Restatement (Second) of Torts in West v. Caterpillar Tractor Co., 336 So.2d 80 (Fla. 1976). In order for strict liability to apply to the manufacturer, the transformers in this instance must have been used for the purpose intended. In the instant case, High's injury resulted from dismantling the transformers and coming into contact with the PCBs as a result of this process. We agree with the district court that section 402A does not apply because of the substantial alteration of the product when High came into contact with the contaminated oil. Secondly, section 402A applies to intended uses of products for which they were produced. When an injury occurs under those circumstances, the manufacturer is strictly liable. We find, under the circumstances in the instant case, that dismantling a product is not an intended use as prescribed by section 402A. Therefore, we find, under these facts, that strict liability does not apply.
The second question we must address concerns liability based on negligence. We find that a manufacturer has a duty to warn of dangerous contents in its product which could damage or injure even when the product is not used for its intended purpose.[4] This issue, which is not directly addressed by the district court of *1263 appeal, is whether Westinghouse was negligent in warning FPL of the possible danger of PCB contamination.
We find that Westinghouse had a duty to timely notify the entity to whom it sold the electrical transformers, FPL in the instant case, once it was advised of the PCB contamination. The record reflects that Monsanto, the PCB manufacturer, notified Westinghouse sometime between 1970 and 1972, of the dangerous toxic propensities of PCBs used by Westinghouse. We find that Westinghouse's November 22, 1976, letter to its utility customers, including FPL, relaying PCB information was adequate notice. However, whether or not the letter was timely is a question of fact that has not been resolved by this record. As stated earlier, Monsanto informed Westinghouse sometime between 1970 and 1972 of the dangers regarding PCB contamination, and in 1976, Westinghouse informed FPL that some products were contaminated. If Westinghouse knew or should have known from its early 1970s communications with Monsanto that some mineral oil transformers contained PCBs, then it is clear from the record that Westinghouse delayed in warning FPL of the contamination of these transformers. Although we hold that Westinghouse's letter to FPL was adequate notice, we find that Westinghouse had a duty to timely notify FPL so that FPL could timely notify Pepper's of the possible danger that could occur in dismantling the transformers so that it could proceed in the prescribed manner. If this notice was not timely, then the next question is whether the lack of timely notice by Westinghouse was the proximate cause of High's injury. Given the circumstances, we find the knowledge by Westinghouse of the PCB contamination in its transformers and the timeliness of Westinghouse's notice to FPL of that contamination are issues of fact that must be resolved in this case and are not proper for summary judgment.
For the reasons expressed, we approve in part and quash in part the decision of the district court of appeal and remand for further proceedings consistent with this opinion.
It is so ordered.
SHAW, C.J., and McDONALD, GRIMES and HARDING, JJ., concur.
BARKETT, J., concurs in part and dissents in part with an opinion, in which KOGAN, J., concurs.
KOGAN, J., concurs in part and dissents in part with an opinion, in which BARKETT, J., concurs.
BARKETT, Justice, concurring in part and dissenting in part.
I, like Justice Kogan, agree with the majority's disposition of the duty-to-warn issue but also find the case presents a valid claim for strict liability.
The majority is correct in stating that section 402A of the Restatement (Second) of Torts "applies to intended uses of products for which they were produced." Majority op. at 1262 (emphasis added). The majority's deficiency, however, is in failing to define "intended uses." The prevailing view recognizes that an "intended use" includes unintended uses of a product if they were reasonably foreseeable by the defendant. See, e.g., Bloxom v. Bloxom, 512 So.2d 839, 843 (La. 1987) ("`Normal use' is a term of art that includes all intended uses, as well as all foreseeable uses and misuses of the product."); J.I. Case Co. v. McCartin-McAuliffe Plumbing, 118 Ill.2d 447, 114 Ill.Dec. 105, 516 N.E.2d 260, 266 (1987) ("Misuse is the use of a product `for a purpose neither intended nor "foreseeable" (objectively reasonable) by the defendant' and may defeat a cause of action."); see also M. Stuart Madden, Products Liability § 13.9, at 20 (1988) (and cases cited therein) ("[A] use of the product for a purpose, or in a manner neither intended nor reasonably foreseeable will bar recovery. However, some abnormal, or unintended uses will not constitute a legal misuse of the product, if they are reasonably foreseeable.").
As the majority apparently recognizes, foreseeability is usually a jury question. See majority op. at 1262. Neither the majority *1264 opinion nor the cases cited therein explain why that determination should be removed from the jury in this instance or why, as a matter of law, the manufacturer would not have reasonably foreseen that its product would be dismantled.
KOGAN, J., concurs.
KOGAN, Justice, concurring in part, dissenting in part.
The central premise underlying the law of strict liability is that a for-profit enterprise is better able to shoulder, and therefore must assume strict liability for, the dangerous products it creates:
The courts [in strict liability cases] have tended to lay stress upon the fact that the defendant is acting for his own purposes, and is seeking a benefit or a profit from such activities, and that he is in a better position to administer the unusual risk by passing it on to the public than is the innocent victim.
W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 75, at 537 (5th ed. 1984). In other words, the "little man" should not be made to suffer when the for-profit enterprise that released a dangerous product into commerce can absorb the loss.
I see no reason why this principle should not be applied here. The facts disclose that Westinghouse released into commerce a product containing the highly dangerous chemicals called PCBs. While these chemicals were sealed inside transformers, surely Westinghouse cannot now contend that it was "unforeseeable" these transformers would some day be breached and would release their PCBs. It is obvious and foreseeable that whatever is sealed inside a container some day is likely to be released again. If people are injured by that release, then strict liability should exist.
This case is only little different from a toy manufacturer constructing a rubber ball inflated with a poisonous liquid. Obviously, the toy manufacturer does not intend for the liquid to be released; but if a child chews through the rubber coating and is poisoned by the liquid inside, I certainly believe any court in this state would hold the manufacturer strictly liable. We would not resolve such a case, as the majority does here, simply by noting that the manufacturer did not intend its product to be dismantled in this particular manner. Majority op. at 1262.
While I agree with the majority on the duty-to-warn issue, I believe the present case also presents a valid claim for strict liability. Here, transformers were created by a for-profit enterprise. Inside these transformers was a dangerous liquid. This plaintiff has alleged that he was injured when that liquid was released again into the environment. In such an instance, any injury that has resulted should be borne by the party best able to absorb the loss  the manufacturer. Accordingly, I would allow the case to proceed on an alternative theory of strict liability.
BARKETT, J., concurs.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(4), Florida Constitution.
[2] In the letter and indemnity agreement, Westinghouse agreed to indemnify and hold harmless Monsanto from Westinghouse's use of PCBs purchased from Monsanto. We note that Judge Ferguson, in his dissent in High v. Westinghouse Electric Corp., 559 So.2d 227, 230 n. 4 (Fla.3d DCA 1989) (Ferguson, J., dissenting), stated:

The dielectric fluid or oils containing PCBs were purchased from Monsanto Corporation. In early 1970 Monsanto notified transformer manufacturers, including Westinghouse, of the dangerous, toxic propensities of the PCBs used in electrical transformers. The record contains a Letter and Indemnity Agreement dated January 15, 1972, between Monsanto and Westinghouse, obligating Monsanto to pay for damages which Westinghouse might be required to pay in the event of any injury caused by the PCBs.
Westinghouse disputes that this agreement acknowledged notice that the mineral oil transformers at issue contained PCBs.
[3] The pertinent portion of the letter read as follows: "In addition, when performing repair, routine maintenance or disposal, oil-filled transformers should be checked for the presence of PCBs. We also suggest that you check your own transformer oil storage and handling systems for possible presence of PCBs."
[4] Tampa Drug Co. v. Wait, 103 So.2d 603 (Fla. 1958); Advance Chem. Co. v. Harter, 478 So.2d 444 (Fla. 1st DCA 1985), review denied, 488 So.2d 829 (Fla. 1986); Mathis v. National Lab., 355 So.2d 117 (Fla. 3d DCA 1978).