[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-14104

_____

NBIS CONSTRUCTION & TRANSPORT INSURANCE
SERVICES, INC.,
other
Sims Crane & Equipment Company,

Plaintiff-Appellee,

*versus*

LIEBHERR-AMERICA, INC.,
d.b.a. Liebherr USA Co.,
LIEBHERR CRANES, INC.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:19-cv-02777-AAS

_____

Before WILSON, GRANT, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

This appeal requires the application of Florida tort law to a dispute resulting from the collapse of a crane boom. Below, NBIS Construction & Transport Insurance Services, Inc. ("NBIS"), the third-party administrator and managing general agent of the insurer of the crane's owner, recovered over $1.7 million—the cost of the damage to the crane itself—in a negligence suit against Liebherr-America, Inc., a distributor and servicer of the type of crane at issue. Central to this appeal, the magistrate judge,[1] after a five-day bench trial, rejected Liebherr-America's argument that Florida's economic loss rule shielded it from liability. For the following reasons, we find Florida law unclear on this issue, and thus certify a question to the final arbiter of Florida law, the Florida Supreme Court.

---

[1] The parties consented to trial before the magistrate judge pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.

## I.　　FACTUAL AND PROCEDURAL BACKGROUND[2]

In 2016, Sims Crane & Equipment Company ("Sims") purchased a crane, manufactured by Liebherr Werk Ehingen GMbH ("Liebherr-Germany"), from a non-party crane broker. The crane has two configurations: a fifty-meter boom and an eighty-four-meter boom. The eighty-four-meter boom has six locking pins: T1 through T6. The T3 and T4 pins are located next to each other and look similar. To install the longer, eighty-four-meter boom, the T3 pin must be adjusted to a specific position. The T4 pin, on the other hand, should never be adjusted—if it is and the adjustment is not remedied, the boom can collapse. But the crane's operating manual, published by Liebherr-Germany and provided to Sims before it received the crane, did not include warnings about the T4 pin.

Under Sims's sales contract, a "Liebherr [f]actory trained technician" was "to be provided on site to commission [the crane] and train [Sims's] personnel at [n]o [c]harge." The purpose of this training, Liebherr-America's corporate representative agreed, was to provide "comprehensive knowledge" to crane operators on how to properly and safely operate the crane.[3]

---

[2] The majority of the facts in section are taken from the magistrate judge's factual findings in its final order.

[3] The basis of the training, according to Liebherr-America's training documents, was the crane's operating manual.

When two Sims crane operators—Jason D'Angelo and Andrew Farris—picked up the crane at a port in Jacksonville in January 2017, a Liebherr-America employee and trainer named Henry Ward instructed the two operators and other Sims employees while they were loading the crane to transport it Tampa.  The training continued in Tampa from January 30, 2017, to February 4, 2017.  Even though Liebherr-America normally provides around eighty hours of training to new customers, and Ward knew Sims was a first-time owner of the crane, Ward provided D'Angelo and Farris with only forty hours of training.

While Ward's training involved swapping out the fifty-meter and eighty-four-meter booms, he skipped training on multiple issues.  Further, both Farris and D'Angelo testified that Ward did not train Sims's employees on the proper placement of specific pins, including the T3 and T4 pins.  For example, while the T3 pin needed to be adjusted to a specific position, Ward only instructed Farris and D'Angelo to adjust it "to where it stops," but not to "over-torque" it, and to "back it out until it stops."  Liebherr-America's corporate representative also testified that Ward did not inform Sims of the risks with respect to the T4 pin, even though Liebherr-America knew about the safety risks associated with manipulating the T4 pin at the time of the training.[4]

---

[4] While Ward testified that he warned Farris and D'Angelo more than "two or three times" about the dangers related to manipulating the T4 pin, the magistrate judge found this testimony "not credible" in light of the contradictory

On February 16, 2018, Farris supervised apprentice Shane Burrows during the installation of the eighty-four-meter boom for a construction project. When Farris instructed Burrows to lock the T3 pin, Burrows mistakenly manipulated the T4 pin instead, thinking it was the T3 pin. After Burrows notified Farris that the pin was unlocking rather than locking, Farris discovered that Burrows manipulated the T4 pin and adjusted the T4 pin back to where he thought it was originally. Farris then installed the eighty-four-meter boom and locked the T3 pin.

A few days later, when Farris started to extend out the boom, it would not fully extend, even though the crane's computer system read no errors. Farris contacted his supervisor, who dispatched a crane technician to the jobsite. Farris also contacted a senior crane operator, who advised him that he would have to place the crane in manual mode to extend the boom. However, when Farris took the crane out of computer control mode and proceeded to manually extend the boom, it collapsed in on itself, causing both a fatality and damage to the crane.

Prior to this collapse in May 2017 another collapse due to the improper manipulation of the T4 pin had occurred in Japan. This led Liebherr-Germany to publish, three months before the accident in this case, updated product safety information concerning the risks involved with manipulating the T4 pin. This information included a product safety bulletin, a cover plate that covers both the

testimony from Farris, D'Angelo, and Liebherr-America's corporate representative.

T3 and T4 pins, warning stickers, and an insert for the operating manual.  The top of the safety bulletin provided that the failure to follow the instructions contained therein "could result in the uncontrolled retraction of the telescopic boom during operation resulting in serious injury or death."  The bulletin then proceeded to warn that manipulating the wrong screw, or pin, can lead to such retractions.

The cover plate is a different color than the crane, and the warning stickers for the T4 pin, placed on and around the cover plate, had a red "X" drawn on them.[5]  The new provision for the operating manual includes a warning stating "[d]o not unlock the telescopic boom locking pin."  And it goes on to provide that unlocking the T4 pin can cause a retraction of the boom "in an uncontrolled manner," which could lead to "[d]eath, severe bodily injuries, [and] property damage."

Liebherr-America disseminates Liebherr-Germany's product safety updates to American owners, and from October 2017 to March 2018, disseminated over 700 product safety update campaigns.  Once Liebherr-America is on notice that a crane has been sold to a subsequent purchaser, it sends these updates to that purchaser.  And Liebherr-America also typically updates its internal database to ensure that it matches the correct ownership information.

---

[5] Liebherr-Germany provided stickers for the T3 pin too.  Those did not have an "X" drawn on them.

22-14104                 Opinion of the Court                 7

While Liebherr-Germany asked Liebherr-America to check its customer list in advance of disseminating the safety information regarding the T4 pin and to inform Liebherr-Germany if all the listed cranes remained in the United States, Liebherr-America did not update its ownership records with respect to the crane at issue until after the collapse occurred. As a consequence, while Liebherr-America received the safety bulletin on November 10, 2017, Sims did not receive it until February 26, 2018, a week after the accident at issue.[6] This is despite various internal communications and documents, dating back to 2016, referencing Sims as the crane's owner.

After the crane boom's collapse, NBIS filed an action in Florida state court, which Liebherr-America removed to federal district court.[7] NBIS's first amended complaint asserted three counts: (1) negligence; (2) negligent training; and (3) a violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA").[8] As for the

---

[6] Sims received the cover plate, warning stickers, and related safety warnings on the same day.

[7] In Florida, "when an insurer pays the claim of its insured, the insurer stands in the shoes of its insured, and the insurer may bring a subrogation action against the tortfeasor to recover the amounts paid under the insurance policy." *State Farm Fla. Ins. Co. v. Loo*, 27 So. 3d 747, 748 (Fla. 3d DCA 2010). Here, NBIS paid Sims the fair market value of the crane as it was before it was damaged, and thus stands in Sims's shoes.

[8] The district court granted summary judgment to Liebherr-America on the FDUPTA claim by approving the magistrate judge's report and recommendation, and, after the bench trial, the magistrate judge granted Liebherr-

negligence count, NBIS alleged that Liebherr-America was negligent for failing to properly train Sims's employees in usage of the crane and for failing to send the product safety bulletin in a timely manner. NBIS sought to recover only for the damage to the crane itself that resulted from the collapse. In response, Liebherr-America argued, among other things, that Florida's economic loss rule prevented recovery, that it had no duty to protect NBIS against purely economic harms, and that its actions were not a cause of the crane boom's collapse. Importantly, before trial, the parties stipulated that the crane "was not defective at any time prior to or at the time of the incident that occurred on February 19, 2018."

After a five-day bench trial, the magistrate judge rejected Liebherr-America's defenses to NBIS's negligence claim. In its final order, the magistrate judge described the economic loss rule as precluding "a tort claim against a product manufacturer when the product damages only itself." And here, the magistrate judge said, "the parties stipulate that the crane was not defective, and the accident was not caused by a defect in the crane." Thus, NBIS's action was not a products liability action, but instead "an action alleging negligent services provided by Liebherr-America," meaning the economic loss rule does not apply. The magistrate judge then determined that Liebherr-America had a duty "to provide training that included information about manipulation of the T4 pin, and the proper position of the T3 pin," and a duty to "timely send the

America's motion for partial findings with respect to the negligent training claim. Neither decision is on appeal.

product safety warnings." The magistrate judge concluded that these duties were breached, and that these breaches were a proximate cause of the crane boom's collapse. As a result, the magistrate judge awarded NBIS with $1,744,752.74 in damages, as well as prejudgment and post judgment interest.[9]

This timely appeal ensued.

## II.    ANALYSIS

"As a federal court sitting in diversity jurisdiction, we apply the substantive law of the forum state, in this case Florida." *Horowitch v. Diamond Aircraft Indus., Inc.*, 645 F.3d 1254, 1257 (11th Cir. 2011). Thus, we start by providing a summary of Florida law on the economic loss rule. We then turn to the parties' arguments and explain why we find certification to the Florida Supreme Court is needed.[10]

---

[9] NBIS paid Sims $3,215,239 and paid $179,513.74 for towing and salvage expenses. NBIS then recovered $1,650,000 by selling the crane after the accident, which left $1,744,752.74 in damages. On Liebherr-America's motion, the magistrate judge later entered an amended final judgment lowering the amount of prejudgment interest to exclude the time during which the trial was postponed due to Covid-19.

[10] Liebherr-America also argues on appeal that it had no duty to protect against damage to the crane, and that even if it did, there was no breach that caused the crane to collapse. We do not address the magistrate judge's findings and conclusions as to each issue at this stage, for we find that we first need guidance from the Florida Supreme Court as to the application of the economic loss rule.

### A.        Florida's Economic Loss Rule

"[T]he economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 401 (Fla. 2013).[11] It developed in large part to "protect manufacturers from liability for economic damages caused by a defective product beyond those damages provided for by warranty law." *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 538 (Fla. 2004), *receded from on other grounds by Tiara*, 110 So. 3d 399; *see also Tiara*, 110 So. 3d at 401 ("A historical review of the doctrine reveals that it was introduced to address attempts to apply tort remedies to traditional contract law damages.").

---

[11] The Florida Supreme Court has defined economic losses as "'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property.'" *Casa Clara Condo. Ass'n, Inc. v. Charley Toppino and Sons, Inc.*, 620 So. 2d 1244, 1246 (Fla. 1993) (quoting Note, *Economic Loss in Products Liability Jurisprudence,* 66 Colum. L. Rev. 917, 918 (1966)), *receded from on other grounds by Tiara*, 110 So. 3d 399. The Florida Supreme Court has further explained that economic loss "includes 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.'" *Id.* (quoting Comment, *Manufacturers' Liability to Remote Purchasers for "Economic Loss" Damages–Tort or Contract?*, 114 U. Pa. L. Rev. 539, 541 (1966)). And the Florida Supreme Court has also defined economic loss more broadly "as the loss of the 'benefit of [the plaintiff's] bargain.'" *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 536 n.1 (Fla. 2004), (quoting *Casa Clara*, 620 So. 2d at 1246), *receded from on other grounds by Tiara*, 110 So. 3d 399.

At common law, consumers were inhibited from recovery in a products liability case in the absence of privity of contract. *See Matthews v. Lawnlite Co.*, 88 So. 2d 299, 300 (Fla. 1956). Florida and other jurisdictions, however, eventually "imposed liability on a manufacturer for personal injury caused by the manufacturer's failure to exercise reasonable care in the adoption of a safe plan or design for a product placed in the stream of commerce, regardless of privity." *Am. Aviation*, 891 So. 2d at 538 (citing *Matthews*, 88 So. 2d at 300). Then, in *West v. Caterpillar Tractor Co.*, the Florida Supreme Court held "that a manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." 336 So. 2d 80, 92 (Fla. 1976).

After *West*, "the issue arose as to whether the courts should permit a cause of action in tort by one who suffered purely economic loss due to a defective product." *Tiara*, 110 So. 3d at 403. The seminal case answering this question is *Florida Power & Light Co. v. Westinghouse Electric Corp.*, 510 So. 2d 899 (Fla. 1987). There, Florida Power & Light ("FPL") entered into contracts with Westinghouse in which Westinghouse agreed to design, manufacture, and supply two nuclear steam supply systems, which included six steam generators. *Id.* at 900. After FPL discovered leaks in all six steam generators, it sued Westinghouse in federal court, alleging that Westinghouse was liable for both breach of express warranties and negligence. *Id.* FPL sought damages for the cost of repair, revision, and inspection of the steam generators. *Id.* With respect to the negligence claim, FPL alleged "that Westinghouse negligently

designed and manufactured the steam generators, failed to provide proper operating instructions, and failed to warn of potential problems." *Id.* This Court certified two questions to the Florida Supreme Court, asking, among other things, "[w]hether Florida law permits a buyer under a contract for goods to recover economic losses in tort without a claim for personal injury or property damage to property other than the allegedly defective goods." *Id.* at 899. And the Florida Supreme Court answered no, holding that "contract principles [are] more appropriate than tort principles for resolving economic loss without an accompanying physical injury or property damage." *Id.* at 902.

Thus, as the Florida Supreme Court later explained, "[i]n exchange for eliminating the privity requirements of warranty law and expanding the tort liability for manufacturers of defective products which cause personal injury, [it] expressly limited tort liability with respect to defective products to injury caused to persons or damage caused to property other than the defective product itself." *Am. Aviation*, 891 So. 2d at 541. This rule "applies even in the absence of privity of contract." *Id.*

At one time, the Florida Supreme Court also "expand[ed] the application of the rule beyond its [product liability] origins." *Moransais v. Heathman*, 744 So. 2d 973, 980 (Fla. 1999), *receded from on other grounds by Tiara*, 110 So. 3d 399. For example, in *AFM Corp. v. Southern Bell Telephone & Telegraph Co.*, the plaintiff entered into an agreement with the defendant to include the plaintiff's advertising in a telephone directory. 515 So. 2d 180, 180 (Fla. 1987). But

the defendant listed the plaintiff's old phone number, mistakenly assigned that number to another customer, and then failed to successfully remedy the issue. *Id.* at 180–81. As a result, the plaintiff subsequently sued in tort to recover the economic losses. *Id.* at 181. The Florida Supreme Court, however, held that the plaintiff was barred from suing in tort, relying in part on the economic loss rule. *See id.* at 181–82.

The Florida Supreme Court, however, has retreated from this expansion. In *American Aviation*, the Florida Supreme Court "recede[d] from *AFM Corp.* to the extent that it relied on the principles adopted by this Court in *Florida Power*." 891 So. 2d at 542. The Florida Supreme Court also refused to apply the rule in cases concerning professional malpractice, fraudulent inducement, negligent misrepresentation, and statutory causes of action. *See id.* at 543 (listing exceptions). Then, in *Tiara*, the Florida Supreme Court receded from its "prior rulings to the extent that they have applied the economic loss rule to cases other than products liability," and returned "the economic loss rule to its origin in products liability." 110 So. 3d at 407. This remains the state of the doctrine in Florida today.

## B.    Parties' Arguments

Liebherr-America argues that the economic loss rule applies because this is a products liability case, despite the parties' stipulation that the crane was not defective. Florida law, as Liebherr-America explains, imposes on distributors like Liebherr-America a duty to warn of the potential dangers of a product. With respect

to "inherently dangerous" products, the Florida Supreme Court explained the duty this way:

> When a distributor of an inherently dangerous commodity places it in the channels of trade, then by the very nature of his business he assumes the duty of conveying to those who might use the product a fair and adequate warning of its dangerous potentialities to the end that the user by the exercise of reasonable care on his own part shall have a fair and adequate notice of the possible consequences of use or even misuse.

*Tampa Drug Co v. Wait*, 103 So. 2d 603, 607 (Fla. 1958), *receded from in part by Felix v. Hoffmann-LaRoche, Inc.*, 540 So. 2d 102 (Fla. 1989). And long ago, the Florida Supreme Court said that "a crane in operation is inherently dangerous." *Geffrey v. Langston Constr. Co.*, 58 So. 2d 698, 699 (Fla. 1952); *see Grove Mfg. Co. v. Storey*, 489 So. 2d 780, 782 (Fla. 5th DCA 1986) (applying *Wait* in a case concerning the warnings accompanying a crane). The Florida Supreme Court has also found that a "a manufacturer has a duty to warn of dangerous contents in its product which could damage or injure even when the product is not used for its intended purpose." *High v. Westinghouse Elec. Corp.*, 610 So. 2d 1259, 1262 (Fla. 1992).

Florida's intermediate appellate courts have applied the duty to warn in various cases, including those involving goods with "dangerous propensities." *See, e.g.*, *Scheman-Gonzalez v. Saber Mfg. Co.*, 816 So. 2d 1133, 1139 (Fla. 4th DCA 2002) ("Unless the danger is obvious or known, a manufacturer has a duty to warn where its

product is inherently dangerous or has dangerous propensities."); *Advance Chem. Co. v. Harter*, 478 So. 2d 444, 447 (Fla. 1st DCA 1985) ("Although the *Wait* case speaks of the duty to warn in terms of an 'inherently dangerous' product, it is clear that the duty to warn arises when the product has dangerous propensities as well."); *see also, e.g.*, *Rodriguez v. New Holland N. Am., Inc.*, 767 So. 2d 543, 544–45 (Fla. 3d DCA 2000). And this duty to warn exists even if the product is non-defective. *See, e.g.*, *Cohen v. Gen. Motors Corp., Cadillac Div.*, 427 So. 2d 389, 390 (Fla. 4th DCA 1983) ("[A] warning of a known danger in a non-defective machine is required in the exercise of reasonable care. . . . [A] supplier of a product who knows or has reason to know that the product is likely to be dangerous in normal use has a duty to warn those who may not fully appreciate the possibility of such danger."); *Dayton Tire & Rubber Co. v. Davis*, 348 So. 2d 575, 581 (Fla. 1st DCA 1977) (explaining that the *Wait* Court "imposed a strict duty to adequately warn the consumer of a product's dangerous propensities when that product by its very nature, free of defect, is dangerous"), *quashed on other grounds sub nom. Goodyear Tire & Rubber Co. v. Hughes Supply, Inc.*, 358 So. 2d 1339 (Fla. 1978).

Further, Florida courts have described cases concerning this duty to warn as "products liability action[s] . . . based on negligence." *West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 90 (Fla. 1976); *see also, e.g.*, *R.J. Reynolds Tobacco Co. v. Nelson*, 353 So. 3d 87, 89 (Fla. 1st DCA 2022) (discussing "Florida law addressing product liability based on negligent design and negligent failure to warn"); *Emerson Elec. Co. v. Garcia*, 623 So. 2d 523, 524 (Fla. 3d DCA 1993) (reviewing

a jury verdict in a "products liability case" in which one of the theories of liability was the "negligent failure to warn"); *Advance Chem. Co.*, 478 So. 2d at 445–48 (describing a case concerning the "negligent failure to warn" as a "products liability case").

Additionally, under Florida's strict products liability law, a product may be defective because of an inadequate warning. *Ferayorni v. Hyundai Motor Co.*, 711 So. 2d 1167, 1170 (Fla. 4th DCA 1998); *see also Force v. Ford Motor Co.*, 879 So. 2d 103, 106 (Fla. 5th DCA 2004) ("In the byzantine world of products liability, there are three basic families of defects that may be the subject of strict product liability: manufacturing defects, design defects, and failures to warn."). In such a case, a plaintiff must prove "that the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution." *Ferayoni*, 711 So. 2d at 1172 (quoting *Anderson v. Owens–Corning Fiberglas Corp.*, 810 P.2d 549, 558 (Cal. 1991)) (emphasis removed).

Here, Liebherr-America argues, both theories of negligence—the failure to adequately train and the failure to promptly send the product safety bulletin—are in essence failure to warn claims.

For an example of the economic loss rule applied to a failure to warn claim, Liebherr-America directs us to the Florida Supreme Court's decision in *Airport Rent-A-Car, Inc. v. Prevost Car, Inc.*, 660 So. 2d 628 (Fla. 1995), *receded from on other grounds by Tiara*, 110 So.

3d 399.  There, we certified three questions to the Florida Supreme Court, including one asking whether, "under Florida law, a cause of action may exist outside the bar of the economic loss rule where the plaintiffs allege a duty to warn which arose from facts which came to the knowledge of the company after the manufacturing process and after the contract." *Id*. at 629.  The Florida Supreme Court answered no: the "failure to warn, without the requisite harm [to person or other property], will not circumvent the economic loss rule" in such circumstances. *Id*. at 632.  There is another example too.  In *Florida Power & Light*, one of FPL's allegations was that Westinghouse "failed to warn of potential problems" with respect to the steam generators at issue.  510 So. 2d at 900.  And the Florida Supreme Court, of course, concluded that the economic loss rule applied to bar FPL's claim. *Id*. at 902.

NBIS, in response, hangs its hat on the parties' stipulation that the crane itself was not defective.  Because it is not "pursuing a product liability action asserting a product defect," but is instead suing Liebherr-America for "negligent services," it argues that the economic loss rule is inapplicable.  For this reason, NBIS argues that *Airport-Rent-A-Car* is distinguishable, for there the plaintiff asserted a product defect while here the parties have agreed that the crane was not defective.  And the same is true with respect to the steam generators at issue in *Florida Power & Light*, which were also allegedly defective.  510 So. 2d at 899.

### C.    Certification

We find Florida law unclear as to the economic loss rule's applicability here.  On one hand, we see merit in Liebherr-America's argument that NBIS's theories of negligence are like the failure to warn theories found in products liability law.  If Liebherr-America could not be held liable for economic loss resulting from an inadequate training manual under Florida's economic loss rule, then it makes sense for that rule to also shield Liebherr-America from liability for economic loss arising from its failure to adequately train Sims and to promptly send the product safety bulletin.

On the other hand, NBIS is correct that cases concerning product defects are at the heart of Florida's economic loss rule.  Indeed, "from the outset, the focus of the economic loss rule was directed to damages resulting from defects in the product itself." *Tiara*, 110 So. 3d at 404; *see also id.* at 410 (Pariente, J., concurring) ("We now eliminate once and for all any confusion in the application of the economic loss rule . . . and clearly espouse Justice Wells' view that 'the economic loss rule should be limited to cases involving a product which damages itself by reason of a defect in the product.'") (quoting *Moransais*, 744 So. 2d at 984 (Wells, J., concurring))); *Am. Aviation*, 891 So. 2d at 538 ("[T]he products liability economic loss rule developed to protect manufacturers from liability for economic damages caused by a defective product beyond those damages provided for by warranty law.").  Even the case on which Liebherr-America relies, *Airport Rent-A-Car*, concerned a defective product.  660 So. 2d at 629, 632.  And while Liebherr-America is a distributor of the crane at issue, we wonder how applying Florida's

22-14104               Opinion of the Court                    19

economic loss rule in this case might affect Florida's tort law with respect to defendants who are not in the distributive chain. In other words, if a defendant, not in the distributive chain, negligently trained Sims and the collapse of the crane's boom resulted, would the economic loss rule still apply? If the answer is yes, then that would appear to be an extension of Florida's economic loss rule in tension with *Tiara* and *Am. Aviation*. And if the answer is no, then it is worth considering why it makes sense to exempt Liebherr-America from liability solely because it is a distributor of the product at issue.

These are all questions and considerations, however, for the Florida Supreme Court, not this Court. "When faced with substantial doubt on a dispositive state law issue, our 'better option is to certify the question to the state supreme court.'" *WM Mobile Bay Env't Ctr., Inc. v. City of Mobile Solid Waste Auth.*, 972 F.3d 1240, 1251 (11th Cir. 2020) (quoting *In re Mooney*, 812 F.3d 1276, 1283 (11th Cir. 2016)). Certification serves interests "of federalism and comity," *Steele v. Comm'r of Soc. Sec.*, 51 F.4th 1059, 1065 (11th Cir. 2022), and provides us with "'what we can be assured are "correct" answers to state law questions.'" *Miss. Valley Title Ins. Co. v. Thompson*, 754 F.3d 1330, 1334 (11th Cir. 2014) (quoting *Forgione v. Dennis Pirtle Agency, Inc.,* 93 F.3d 758, 761 (11th Cir. 1996)). Given that Florida's economic loss rule is a doctrine of the Florida Supreme Court's making, that court, not this one, should determine whether it applies in circumstances not already addressed in the case law.

We therefore certify to the Florida Supreme Court the following question:[12]

> Whether, under Florida law, the economic loss rule applies to negligence claims against a distributor of a product, stipulated to be non-defective, for the failure to alert a product owner of a known danger, when the only damages claimed are to the product itself?

As always, our phrasing of these questions serves "only as a guide." *United States v. Clarke*, 780 F.3d 1131, 1133 (11th Cir. 2015). "[W]e do not mean, by our presentation of the issue, our phrasing of the question, or otherwise, to restrict the Florida Supreme Court's analysis of this or any other issue it chooses to address." *Id.* And "if we have overlooked or mischaracterized any state law issues or inartfully stated" the question we have posed "we hope the [Florida] Supreme Court will feel free to make the necessary corrections." *Spain v. Brown & Williamson Tobacco Corp.*, 230 F.3d 1300, 1312 (11th Cir. 2000).

## III.    CONCLUSION

For these reasons, we defer our decision in this case until the Florida Supreme Court has had the opportunity to consider and determine whether to exercise its discretion in answering our

---

[12] The Florida Supreme Court "[m]ay review a question of law certified by the Supreme Court of the United States or a United States Court of Appeals which is determinative of the cause and for which there is no controlling precedent of the supreme court of Florida." Fla. Const. art. V, § 3(b)(6); *see also* Fla. Stat. § 25.031. And Florida Rule of Appellate Procedure 9.150 "establishes the procedures governing those discretionary proceedings to review such certified questions." *Steele*, 51 F.4th at 1065 n.3.

22-14104                Opinion of the Court                21

certified question.  The entire record of this case, including the par-
ties' briefs, is transmitted to the Florida Supreme Court.

**QUESTION CERTIFIED.**