David **VELIZ,** as Personal Representative of the Estate of Felipe Valdivia Ignacio, Plaintiff,

v.

**RENTAL SERVICE CORPORATION USA, INC.,** and **Trak International, Inc.** as successor by interest to **Lull International, Inc.,** Defendants.

No. 6:02–CV–1335–ORL–22DAB.

United States District Court, M.D. Florida, Orlando Division.

Dec. 19, 2003.

---

Julio C. Martinez, Jr., Kissimmee, FL, for plaintiff.

Eugene L. Ciotoli, Anthony P. Corsini, Bobo, Ciotoli, Bocchino & Newman, P.A., N. Palm Beach, FL, John Z. Lagrow,

Fisher, Rushmer, Werrenrath, Dickson, Talley & Dunlap, P.A., Jonathan C. Hollingshead, Orlando, FL, for defendants.

## ORDER

CONWAY, District Judge.

## I. INTRODUCTION

This cause comes before the Court for consideration of the Defendant's, Trak International, Inc., as successor by interest to Lull International, Inc., Motion for Final Summary Judgment (Doc. No. 57), filed August 29, 2003, to which the Plaintiff, David Veliz, as the Personal Representative of the Estate of Felipe Valdivia Ignacio, responded (Doc. No. 95) on September 19, 2003; and the Defendant's, Rental Service Corporation USA, Inc., Motion for Summary Judgment (Doc. No. 75), filed September 8, 2003, to which the Plaintiff responded (Doc. No. 105) on September 26, 2003. Having reviewed the motions and memoranda, this Court **GRANTS** the Defendants' Motions for Summary Judgment (Docs. No. 57 and 75).

## II. BACKGROUND

The Plaintiff, David Veliz, is the Personal Representative of the Estate of Felipe Valdivia Ignacio (hereinafter, "Mr. Ignacio" or "the decedent").[1] Although Mr. Ignacio was an undocumented alien in the United States,[2] at all relevant times herein he was employed by AMS Staff Leasing (hereinafter, "AMS") as a laborer.[3] The Defendant, Trak International, Inc. (here-

---

1. *See* Joint Pretrial Statement (Doc. No. 145), § IX (Statement of Stipulated Facts), ¶ a at 19.

2. *See* Doc. No. 75, Ex. D, E, and F.

3. *See* Defendant Trak International, Inc. as successor by interest to Lull International, Inc.'s Motion for Final Summary Judgment (Doc. No. 57), ¶ 3(c) at 2; *see also* Plaintiff's Statement of Genuine Issues of Disputed Material Facts with Respect to Rental Service

inafter, "Trak International"), is a Delaware corporation.[4] It is the successor by interest to Lull International, Inc. (hereinafter, "Lull"),[5] the manufacturer of the Lull 844C–42 Telescopic Handler (hereinafter, "the Lull 844C–42 Telescopic Handler" or "the lift").[6] The Defendant, Rental Service Corporation USA, Inc. (hereinafter, "Rental Service"), is an Arizona corporation[7] engaged in the business of leasing, among other things, the Lull 844C–42 Telescopic Handler.[8] This is a products liability action arising out of an accident involving the Lull 844C–42 Telescopic Handler.[9]

On October 12, 2000, a general contractor hired Collis, Inc. d/b/a Collins Roofing, Co. (hereinafter, "Collis") to perform roofing work at an apartment complex located in Orlando, Florida.[10] As a result, Collis leased several employees from AMS including the decedent, Cesar Rojas (hereinafter, "Mr.Rojas"), and Roy Templeton (hereinafter, "Mr.Templeton").[11] Collis

additionally leased a Lull 844C–42 Telescopic Handler from Rental Service.[12] A Lull 844C–42 Telescopic Handler is a rough terrain fork lift capable of lifting products and materials to high elevations such as a roof by raising a boom.[13] This particular model enables the construction industry to move thousands of pounds of materials to a maximum height of forty-two feet.[14]

When the Lull 844C–42 Telescopic Handler arrived at the construction site, AMS' designated supervisor, Mr. Templeton, took possession of the lift and began transporting roofing materials from a supplier's truck onto the roof of a three story apartment complex.[15] In performing these operations, Mr. Templeton encountered no problems.[16] In other words, the lift worked as intended.

Following several hours of operation, Mr. Templeton turned the lift over to Mr. Rojas, a subordinate co-employee of AMS.[17] Although Mr. Rojas was not prop-

Corporation, Inc's Motion for Summary Judgment (Doc. No. 106), ¶ 15 at 3.

**4.** *See* Doc. No. 145, § IX (Statement of Stipulated Facts), ¶ c at 19.

**5.** *See id.,* ¶ d at 19.

**6.** *See id.,* ¶ e at 19.

**7.** *See id.,* ¶ b at 19.

**8.** *See* Complaint (Doc. No. 4), ¶ 13 at 3; *see also* Rental Service's Answer and Affirmative Defenses to Plaintiff's Complaint (Doc. No. 5), ¶ 13 at 4.

**9.** *See generally* Doc. No. 4.

**10.** *See* Deposition of Douglas Lanier (Doc. No. 68) at pg. 4, lines 20–25 through pg. 5, line 1.

**11.** *See id.,* at pg. 5, lines 2–10; *see also* Roy Templeton Deposition (Doc. No. 60) at pg. 4, lines 17–25 through pg. 5, line 2.

**12.** *See* Doc. No. 145, § IX (Statement of Stipulated Facts), ¶ g at 20.

**13.** *See generally* Defendant's, Rental Service Corporation, USA, Inc. Statement of Material Facts Concerning Which There is No Genuine Issue For Trial (Doc. No. 76), Ex. I. (Owner/Operator Manual).

**14.** *See* Doc. No. 76, ¶ 7 at 3; *see also* 29 C.F.R. § 1910.178.

**15.** *See* Doc. No. 60 at pg. 10, lines 7–24; and pg. 31, lines 16–18.

**16.** *See id.* at pg. 10, line 25 through pg. 11, line 5; and pg. 31, line 4 through pg. 32, line 6.

**17.** *See id.* at pg. 14, lines 4–21.

erly certified to operate heavy industrial equipment in accordance with Occupational Safety and Health Administration (hereinafter, "OSHA") requirements,[18] he utilized the Lull 844C–42 Telescopic Handler to transport and raise roofing material from the ground to the third story roof whereupon Mr. Ignacio was working.[19]

Upon removing roofing materials from the lift, Mr. Ignacio stepped off the roof and onto a pallet on the forks of the Lull 844C–42 Telescopic Handler. Thereafter, while Mr. Ignacio was being lowered to the ground, the Lull 844C–42 Telescopic Handler tipped over. Mr. Ignacio sustained fatal injuries as a result.[20]

At the time of the accident, the Lull 844C–42 Telescopic Handler contained warnings cautioning against using the lift as a personnel carrier.[21] In addition, it was equipped with proximity switches that enhanced its stability. However, the Defendants maintain that the proximity switches were bypassed at the time the lift tipped over.[22]

Following an investigation, Mr. Ignacio's Estate received a workers' compensation death benefit.[23] In addition, Collis was cited by OSHA for violating 29 C.F.R. 1910.178(1), which requires employers to ensure that each powered industrial truck operator, prior to operating a powered industrial truck, completes training and an evaluation.[24]

Against that backdrop, Mr. Ignacio's Personal Representative filed this lawsuit against the Defendants alleging negligence (Count I) and strict products liability (Count II).[25] As to Trak International, Count I alleges negligent design, negligent construction, negligent manufacturing, negligent testing, negligent inspection, negligent consideration of warranty claims and/or adjustment records, and negligent warning.[26] As to Rental Service, Count I alleges negligent inspection, maintenance, altering, and warning.[27] In addition, the Plaintiff charges Rental Service with negligence in "[f]ailing to insure that operators of the subject Lull 844C Telescopic Handler were appropriately trained and licensed to handle such machinery." [28] With respect to Count II, the Complaint avers that the Defendants are strictly liable to the Plaintiff inasmuch as Mr. Ignacio's death was caused by the Defendants' introduction of an unreasonably dangerous and defective product into the stream of commerce.[29]

---

**18.** *See id.* at pg. 40, lines 10–13; and pg. 49, lines 3–10.

**19.** *See id.* at pg. 14, lines 9–25 through pg. 16 line 23.

**20.** *See* Doc. No. 145, § IX (Statement of Stipulated Facts), ¶ j at 20.

**21.** *See* Exhibits to Joint Pretrial Statement (Doc. No. 145) at 183 and 208; *see also* Doc. No. 76, Ex. I at pg. 3 and 25.

**22.** *See* Defendant's, Trak International, Inc., as successor by interest to Lull International, Inc., Memorandum of Law in Support of Motion for Final Summary Judgment (Doc. No. 58) at 11–12.

**23.** *See* Doc. No. 76, Ex. Q, ¶ 17 at 4.

**24.** *See id.,* Ex. L at 7.

**25.** *See generally* Doc. No. 4.

**26.** *See id.,* ¶ 20 at 3–4.

**27.** *See id.,* ¶ 22 at 4–5.

**28.** *Id.,* ¶ 22(e) at 5.

**29.** *See id.,* ¶ 29 at 6.

The Defendants now move for summary judgment (Docs. No. 57 and 75) against the Plaintiff on both the negligence and strict liability claims.

## III. ARGUMENTS

In their Motions for Summary Judgment (Docs. No. 57 and 75), the Defendants assert nine rationale for entering judgment as a matter of law in their favor: (1) that the open and obvious doctrine bars the Plaintiff's negligent and defective warning claims; (2) that in any event the warnings afforded here were adequate; (3) that the decedent misused the lift; (4) that the Lull 844C–42 Telescopic Handler's safety devices were bypassed constituting a material alteration of the lift; (5) that workers' compensation immunity protects Rental Service; (6) that in any event the record is bereft of evidence indicating wrongdoing on the part of Rental Service; (7) that the record contains insufficient evidence indicating that Mr. Ignacio provided support to his survivors; (8) that Mr. Ignacio's undocumented alien status precludes an award of lost wages; and (9) that the record contains insufficient evidence of medical expenses. See Docs. No. 57, 58, 75 and 76. This Court will consider each of these arguments seriatim.

## IV. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986). A fact is material if it is one that might affect the outcome of the case. See id. The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those materials that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant satisfies this requirement, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 584, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To meet this burden, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings." Fed.R.Civ.P. 56(e). Nor may the non-moving party rely on a mere scintilla of evidence supporting their position. See Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir.1990). Rather, for a court to find a genuine issue for trial, the non-moving party must establish, through the record presented to the court, that it is capable of providing evidence sufficient for a reasonable jury to return a verdict in its favor. See Cohen v. United Am. Bank, 83 F.3d 1347, 1349 (11th Cir. 1996). When a court considers whether or not to enter summary judgment, it views all of the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. See Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir.1993).

## V. LEGAL ANALYSIS

### A. The Defendants had a Duty to Warn Against Using the Lull 884C–42 Telescopic Handler as a Personnel Carrier but Their Warnings Were Adequate as a Matter of Law

On summary judgment, the Defendants' first argument challenges the Plaintiff's

claim alleging failure-to-warn and/or inadequate warnings. *See* Doc. No. 75 at 5–6; *see also* Doc. No. 58 at 6–9. In that connection, the Defendants contend that they "had no duty to warn Mr. Ignacio of the dangers associated with climbing from the roof of a 3–story building onto the Lull's forks because those dangers are open and obvious." Doc. No. 75 at 5 (emphasis omitted); *see also* Doc. No. 58 at 7 ("Mr. Ignacio's act of stepping or jumping from a roof of at a minimum of thirty-two (32) feet in the air to the forks of a forklift is clearly a danger that is open and obvious") (internal citations omitted).

■ "A duty to warn arises where a product is inherently dangerous or has dangerous propensities ... However, there is no duty to warn of an obvious danger." *Rodriguez v. New Holland N. Am., Inc.*, 767 So.2d 543, 544–45 (Fla. 3rd DCA 2000) (finding no duty to warn that boom on skid-steer loader would crush a foot extended out and over front sill of operator's compartment and into boom's downward path because it was an open and obvious danger) (internal citations omitted); *Ponte v. CSX Transp., Inc.*, 736 So.2d 790 (Fla. 3rd DCA 1999) (finding no duty to warn trespassers, or uninvited guests licensees on its property, of the open and obvious dangers associated with jumping onto moving trains); *Romano v. Palm Beach County*, 715 So.2d 315, 316 (Fla. 4th DCA 1998) (finding no duty to warn of collision with chainlink fence because the risk of colliding with a plainly visible, stationary object is open and obvious).

■ "When a risk is obvious or generally known, the prospective addressee of a warning will or should already know of its existence." *Warren v. K Mart Corp.*, 765

So.2d 235, 238 (Fla. 1st DCA 2000). Thus, "[w]arning of an obvious or generally known risk in most instances will not provide an effective additional measure of safety." *Id.* "Furthermore, warnings that deal with obvious or generally known risks may be ignored by users and consumers and can diminish the significance of warnings about non-obvious, not-generally known risks." *Id.*

In determining whether a danger is open and obvious, courts typically apply an objective test. *See Gibbs v. Republic Tobacco, L.P.*, 119 F.Supp.2d 1288, 1293 (M.D.Fla.2000). "[I]ndividual subjective perceptions of the specific user or injured party are irrelevant in the determination of whether there ever existed a duty to warn." *Id.* (internal citation omitted); *Byrnes v. Honda Motor Co., Ltd.*, 887 F.Supp. 279, 281 (S.D.Fla.1994) ("The obviousness of a danger and adequacy of a warning are determined by a 'reasonable person' standard, rather than on each particular plaintiff's subjective appreciation of the danger") (internal citation omitted).

In this instance, the Defendants cite two cases, *Gillman v. Crown Euip. Corp.*, 1996 WL 464224, 1996 U.S. Dist. Lexis 11667 (N.D.Ill. Aug. 9, 1996), and *Siemens Energy & Automation, Inc. v. Medina*, 719 So.2d 312 (Fla. 3d DCA 1998), *rev. denied*, 733 So.2d 516 (Fla.1999), which they argue establish the open and obvious nature of the danger Mr. Ignacio confronted.

In *Gillman*, the United States District Court for the Northern District of Illinois determined that the Defendant had no duty to warn the Plaintiff about the risk involved in being elevated on a forklift which had no restraints because the danger of falling under such circumstances is a matter of common knowledge and perception. *See id.* at *3, 1996 U.S. Dist.

Lexis 11667 at \*7(N.D.Ill. Aug. 9, 1996). The Court stated that "the dangers accompanying such usage of the device would be plainly apparent to the average layperson. Thus, because the risk of falling was open and obvious, the Defendant had no duty to warn against it." *Id.*

Similarly, in *Siemens*, Florida's Third District Court of Appeal concluded that there is no duty to warn of the danger of standing on top of a 9-foot high piece of equipment that was not designed to be used as a work platform and of the possibility of falling off because of the open and obvious nature of the hazard. *See id.* at 314–15.

Having reviewed *Gillman* and *Siemens*, the Court finds the decisions rendered therein unpersuasive. In those cases, the courts considered the danger associated with falling off an insecure work platform; a risk that would be apparent to the average layperson. In the converse, this case involves the danger associated with falling as a result of heavy equipment tipping over; a risk which is not necessarily open and obvious. *See Brown v. Glade & Grove Supply, Inc.*, 647 So.2d 1033, 1036 (Fla. 4th DCA 1994) (finding danger associated with tractor roll-over resulting from the non-use of a lock-out pin not open and obvious). The Defendants here have confused apples with oranges.

Notwithstanding any application of the open and obvious doctrine, the Defendants alternatively argue that they are not liable to the Plaintiff because they adequately warned against employing the Lull 844C–42 Telescopic Handler as a personnel lift. In that regard, the Defendants allege as follows:

Lull provided decals on the fork carriage and in the operator compartment cau-tioning people against using the lift as a personnel carrier. Also, the operator manual contained statements warning against using the lift as a personnel carrier. [Further], Mr. Ignacio's job site supervisor ... warn[ed] Mr. Ignacio not to ride on the forks of the lift. Thus, even though [the Defendants] had no duty to warn the decedent of the dangers associated with riding the forks of the lift as such an act is an open and obvious danger, Lull provided ample warnings against doing the precise act that Mr. Ignacio did resulting in his [death].

Doc. No. 58 at 7–8; *see also* Doc. No. 75 at 5–6.

■ Under Florida law, "[a] product may be in a defective condition due to a ... defective warning." *Brown v. Glade & Grove Supply, Inc.*, 647 So.2d 1033, 1035 (Fla. 4th DCA 1994) (internal citations omitted). Consequently, a manufacturer may be liable in tort for introducing an otherwise safe product into the stream of commerce solely by virtue of inadequate warnings. *See Ferayorni v. Hyundai Motor Co.*, 711 So.2d 1167, 1170 (Fla. 4th DCA 1998) (citing *Giddens v. Denman Rubber Mfg. Co.*, 440 So.2d 1320, 1323 (Fla. 5th DCA 1983)). In such a case, a plaintiff may proceed under a theory of negligence, strict liability, or both. *See Griffin v. Kia Motors Corp.*, 843 So.2d 336, 339 (Fla. 1st DCA 2003); *see also Ferayorni*, 711 So.2d at 1172.

■ In analyzing a defective or negligent warning claim, "[t]he mere existence of warnings in an instruction manual is not dispositive ..." *Brown*, 647 So.2d at 1035. "A warning may be defective not only by virtue of its inadequate wording, but as a result of its location and the manner in

which the warning is conveyed." *Id.* (internal citation omitted). Thus, "even if the language contained in the instruction manual adequately apprised a user of the dangers, a jury could find the warning defective because it was not permanently affixed to the [product]." *Id.* (internal citation omitted).

Issues relating to the adequacy of a defendant's warnings are ordinarily questions for the jury. However, where warnings are accurate, clear, and unambiguous, the issue is one of law to be resolved by the judge. *See Ragans v. Miriam Collins–Palm Beach Labs. Co.,* 681 So.2d 1173, 1174 (Fla. 2nd DCA 1996); *see also Felix v. Hoffmann–LaRoche, Inc.,* 540 So.2d 102, 105 (Fla.1989) (accord); *Scheman–Gonzalez v. Saber Mfg. Co.,* 816 So.2d 1133, 1139–40 (Fla. 4th DCA 2002) (accord).

In this instance, the Defendants' warnings against using the Lull 844C–42 Telescopic Handler as a personnel lift were accurate, clear and unambiguous.

On both sides of the fork lift carriage, there are large pictorial decals cautioning against riding on the forks of the lift. *See* Exhibits to Joint Pretrial Statement (Doc. No. 145) at 183.[30] Likewise, in the operator's compartment a decal affixed to the side-wall reads as follows:

**NOTICE**

3. THIS MACHINE IS NOT EQUIPPED TO LIFT PERSON-

NEL. NEVER USE THIS MACHINE AS A WORK PLATFORM.

*See id.* at 208.

.Finally, the Lull Operator's Manual [31] is replete with warnings against utilizing the Lull 844C–42 Telescopic Handler as a personnel lift. For instance, on page three (3) of the Operator's Manual it states *"Never allow passengers on the machine."* Doc. No. 76, Ex. I at 3 (emphasis in the original). Further, at page twenty-five (25) the Operator's Manual reads as follows:

**LIFTING PERSONNEL**

LULL® strongly recommends that you **DO NOT** use the rough terrain forklift as a personnel lift. It is designed for material handling **ONLY**. If personnel **MUST** be lifted, lift only in accordance with ASME/ANSI B56.6 1992, Para. 5.15 and with a properly designed work platform.[32]

It is also important to note that prior to the accident, Mr. Templeton saw Mr. Ignacio jump onto the forks of the Lull 844C–42 Telescopic Handler, and specifically warned Mr. Rojas and Mr. Ignacio not to allow people to ride on the forks of the lift or to use it as a personnel carrier. *See* Roy Templeton Deposition (Doc. No. 60) at pg. 21, line 23 through pg. 22, line 11; pg. 65, lines 7–21; and pg. 66, line 14 through pg. 67, line 10.

---

**30.** Although the Plaintiff argues that these warnings are *illegible, in this Court's view* they get the message—do not use the Lull 844C–42 Telescopic Handler as a personnel lift—across.

**31.** The record indicates that the Operator's Manual was on the Lull 844C–42 Telescopic Handler at the time of the accident. *See* Deposition of Roy Templeton (Doc. No. 60) at pg. 53, lines 11–23.

**32.** It is undisputed that at the time of the accident, the Lull 844C–42 Telescopic Handler was not equipped with a proper safety work platform. In other words, Mr. Ignacio was not riding in a special personnel carrier attachment.

The warnings at issue also make apparent the potential harmful consequences of using a Lull 844C–42 Telescopic Handler as a personnel lift. *See Brown,* 647 So.2d at 1036 ("A warning should contain some wording directed to the significant dangers arising from failure to use the product in the prescribed manner, such as the risk of serious injury or death") (internal citation omitted); *Scheman–Gonzalez v. Saber Mfg. Co.,* 816 So.2d 1133, 1139 (Fla. 4th DCA 2002) ("[T]o warn adequately, the product label must make apparent the potential harmful consequences" by containing some "wording directed to the significant dangers from failure to use the product in the prescribed manner, such as the risk of serious injury or death") (internal citation and quotations omitted).

For example, on page i of the Operator's Manual it reads as follows:

**SAFETY ALERT SYMBOL**

**This Safety Alert Symbol means:**

**ATTENTION! BECOME ALERT! YOUR SAFETY IS INVOLVED!**

**When you see this symbol, be alert to the possibility of personal injury or death. Follow the instructions in the safety message.**

*Three Reasons Why Safety is Important to You:*

1. **Accidents disable and kill.**

2. **Accidents cost.**

3. **Accidents can be avoided.**

The Court finds this language "of such intensity as to cause a reasonable man to exercise for his own safety caution commensurate with the potential danger." *Scheman–Gonzalez,* 816 So.2d at 1139 (internal citation omitted).

In light of the foregoing, this Court grants the Defendants summary judgment on the Plaintiff's claims alleging failure to warn and/or inadequate warnings with respect to using the Lull 844C–42 Telescopic Handler as a personnel carrier. Viewing all of the evidence, and all inferences drawn therefrom, in the light most favorable to the Plaintiff, the Court finds that no reasonable jury could conclude that the Defendants' warnings here were inadequate.

**B. The Decedent's Misuse of the Lull 844C–42 Telescopic Handler as a Personnel Carrier Bars the Plaintiff's Strict Liability and Negligence Actions**

The Defendant's, Trak International, next argument on summary judgment challenges the Plaintiff's claim that the Lull 844C–42 Telescopic Handler was defective and/or unreasonably dangerous on the ground of product misuse. *See* Doc. No. 58 at 3–6 & 10–13. In that regard, the Defendant states "[t]he intended purpose of the Lull 844C–42 rough terrain forklift is to transport and lift products and/or materials, not people." *Id.* at 4 (internal citation omitted).

In *High v. Westinghouse Elec. Corp.,* 610 So.2d 1259 (Fla.1992), the Florida Supreme Court concluded that in order for strict liability to apply to the manufacturer, the manufactured product or products at issue "must have been used for the purpose intended." *Id.* at 1262. When the manufactured product or products are not used as intended "strict liability does

not apply." *Id.* In reaching this conclusion, the high court's majority rejected the "the dissenting view that 'intended use' includes unintended uses of a product if they were reasonably foreseeable by the defendant.'" *Jennings v. BIC Corp.*, 181 F.3d 1250, 1256 (11th Cir.1999) (quoting *High,* 610 So.2d at 1263 (Barkett, J., dissenting)).

■ The Lull 844C–42 Telescopic Handler is intended to be used to transport and/or lift products and materials. As the warnings affixed to the Lull 844C–42 Telescopic Handler and spread throughout the Operator's Manual make clear, it is not intended to be used as a personnel lift, especially in the absence of a special personnel carrier attachment. Even the Plaintiff's expert concedes this point:

Q. Would you call it a misuse of the product to carry people on a forklift without such a special personnel carrier attachment?

A. The OSHA law is quite specific that if people are lifted on a forklift they should be in what they call a safety work platform.

Q. Would you call it a misuse of the forklift if they are not?

A. I would have to say yes.

*See* Deposition of Franklin H. Lever (Doc. No. 80) at pg. 16, lines 9–17.

**33.** In his Memorandum in Opposition to Defendant Trak International Inc's Motion for Summary Judgment (Doc. No. 95), the Plaintiff contends that Mr. Ignacio's misuse, if any, of the Lull 844C–42 Telescopic Handler did not proximately cause the accident. *See* Doc. No. 95 at 6. According to the Plaintiff, since the Lull 844C–42 Telescopic Handler at issue had the capacity to lift several thousand pounds, the weight of Mr. Ignacio could not possibly have caused the tip over.

Since use of the Lull 844C–42 Telescopic Handler as a personnel lift was not its intended use, the Defendants here are "not strictly liable for injuries incurred when it [was] so used, even if such use was reasonably foreseeable by [the Defendants]." *Jennings,* 181 F.3d at 1256 (citing *High* 610 So.2d at 1263) (affirming grant of summary judgment in favor of defendant, a cigarette lighter manufacturer, on claim alleging strict liability for injuries arising out of fire set by child because cigarette lighters are not intended to be used as a children's playthings). Accordingly, the Defendants are entitled to summary judgment on the Plaintiff's strict liability claims.[33]

■ Although the Defendants are not strictly liable for the injury caused by their product in this case, they could still be liable if they were negligent and their negligence proximately caused the decedent's injuries. *See Jennings,* 181 F.3d at 1257 (interpreting Florida law). Indeed, the Florida Supreme Court has made clear that notwithstanding the rule in strict liability actions "product misuse is not an absolute bar to a products liability claim sounding in negligence." *Standard Havens Prods., Inc. v. Benitez,* 648 So.2d 1192, 1197 (Fla.1994). Instead:

[M]uch like the earlier demise of the absolute defense of contributory negligence, product misuse merges into the

Having reviewed the record, this Court finds the Plaintiff's argument unavailing. Although Mr. Ignacio's misuse of the lift did not proximately cause the tip over, it certainly caused his injuries and death. Had the parties used the lift as intended—to lift products and materials to higher elevations—Mr. Ignacio would not have been injured in the tip over.

defense of comparative negligence.[34] Consequently, product misuse reduces a plaintiff's recovery in proportion to his or her own comparative fault.

*Id.* at 1197 (footnote added); *see also* 41A Fla. Jur.2d, Products Liability § 105 (2003) ("In products liability actions, comparative negligence is a valid defense if the plaintiff misused the product, that is to say, put it to a use for which it was not intended") (internal citations omitted); 3–71 Matthew Bender & Co., Inc., Florida Torts § 71.01, at p. 5 (2003) ("[P]roduct misuse should not be treated as a discrete defense in the context of a negligence products liability claim. Instead, product misuse has been merged into the defense of comparative negligence. Consequently, product misuse reduces a plaintiff's recovery in proportion to his or her own comparative fault") (internal citation omitted).

This is the case even where a plaintiff knowingly misuses a product in a manner neither intended nor foreseen by the defendant manufacturer. *See Standard Havens Prods., Inc.,* 648 So.2d at 1193; *see also Benitez v. Standard Havens Products, Inc.,* 43 F.3d 1433, 1434 (11th Cir. 1995); Bender, Florida Torts § 71.01, at p. 5 ("Product misuse is not an absolute bar to a products liability claim sounding in negligence. Rather, a plaintiff's unforeseeable misuse of a product is comparative negligence").

However, if a court determines as a matter of law that a defendant was not negligent or that a defendant's negligence was not the cause of the decedent's injury, or if it is determined that the decedent's negligence was the sole legal cause of his injury, the claimant cannot recover. *See Standard Havens Prods., Inc.,* 648 So.2d at 1197 (discussing law of products liability claims sounding in negligence).

In this instance, the Court finds that the decedent's misuse of the Lull 844C–42 Telescopic Handler was the sole legal cause of his injuries. Viewing all of the evidence, and all inferences drawn therefrom, in the light most favorable to the Plaintiff, the Court finds that no reasonable jury could conclude otherwise. Had the lift been utilized as intended—to lift products and materials to higher elevations—Mr. Ignacio would not have been injured. His death is solely attributable to stepping off a third story roof onto a lift suspended high into the air without a special safety personnel carrier attachment. Accordingly, the Defendants are entitled to summary judgment on the Plaintiff's negligence claims as well.

### C. The Alteration of the Lull 844C–42 Telescopic Bars The Plaintiff's Product Liability Claims

■ Along the same lines, Trek International additionally argues for summary judgment on the ground that the Lull 844C–42 Telescopic Handler was substantially altered at the time of the accident; thus, precluding any and all relief. *See* Doc. No. 58 at 3 & 11–12.

As an added safety feature, the Lull 844C–42 Telescopic Handler contains two (2) proximity switches. These switches detect the angle of the boom as it is being

---

**34.** Florida Statute § 768.81(2) details the effect of contributory fault. In relevant part, it reads as follows:

In an action to which this section applies, any contributory fault chargeable to the claimant diminishes proportionately the amount awarded as economic and noneconomic damages for an injury attributable to the claimant's contributory fault, but does not bar recovery.

elevated vertically away from the body of the Lull 844C–42 Telescopic Handler. When the boom angle is in excess of forty degrees, the proximity switches activate a rear oscillation lock that disengages the lift's frame tilt feature significantly enhancing the stability of the Lull 844C–42 Telescopic Handler.

The record in this case reflects that at the time of the accident "dimes were taped over the proximity switches of the Lull 844C–42 [Telescopic Handler]" defeating the safety device. Doc. No. 58 at 11.[35] This alleged bypass occurred despite a warning affixed to the Lull 844C–42 Telescopic Handler which read as follows:

### WARNING

**Do not disconnect or bypass proximity switches. Bypassing proximity switches may result in serious personal injury or death!**

**See operator's manual for instructions.**

*See* Exhibits to Doc. No. 145 at 199. The warning, which was located in an area near the proximity switches, was accompanied by a picture of the Lull 844C–42 Telescopic Handler tipping over on its side with an individual thrown from the operator's compartment. *See id.*

According to the Plaintiff, even if the proximity switches here were bypassed, the Defendant is still liable by virtue of its knowledge that the lift's proximity switches were being routinely and easily bypassed, and its failure to correct the problem. *See* Doc. No. 95 at 4–7, and 11.

In a deposition in a separate case involving a Lull heavy industrial vehicle, Richard B. Baxter, a consultant for Lull, testified that he was aware of almost ten (10) instances in which a Lull vehicle tipped over on account of its proximity switches being bypassed:

Q. Has a similar—Other than the one in Orlando, have their [sic] been any similar events where a machine turned over because the rear axle was not locked out?

A. We have seen instances, not necessarily with injuries, but we have seen instances of machines being tipped over because people have bypassed the proximity switches and driven and operated frame tilts in the raised boom configuration which caused them to tip.

Q. How many occasions?

A. I don't know.

Q. More than ten?

A. I don't think so. Maybe close.

Deposition of Richard B. Baxter (Doc. No. 99) at pg. 102, lines 1–13.

Likewise, Robert Goldie, an employee of Rental Service, testified that bypassing Lull proximity switches is rampant in the construction industry:

Q. Have you ever had any familiarity with the problems with the proximity switches being bypassed as a service problem?

A. Yeah, that's a service problem and it's—I'd like to say it's rampant

---

**35.** In his memoranda in opposition to summary judgment (Docs. No. 95 and 105), the Plaintiff intimates that Bob Whitacre (hereinafter, "Mr. Whitacre"), an investigator for Rental Service, planted the dimes discovered taped over the proximity switches Although Mr. Whitacre spent a substantial amount of time at the scene of the accident, there is no evidence in the record that he tampered with the proximity switches.

though the industry, the construction industry.

Q. It's rampant?

A. Yeah. It's done more often than not. There's many mechanics that have got dollars worth of quarters in their toolbox that they have taken off of proximity switches.

Deposition of Robert Goldie (Doc. No. 100) at pg. 44, lines 1–11.

Notwithstanding this testimony, the Court finds that the Defendant has no duty to design a safety device incapable of being disabled. "The law is clear that, in Florida, the manufacturer is not to assume the role of insurer." *Mendez v. Honda Motor Co.*, 738 F.Supp. 481, 484 (S.D.Fla. 1990) (internal citation omitted). Moreover, "so long as the product poses no unreasonable dangers for consumer use" a manufacturer is "under *no duty* to produce a fail-safe product." *Id.* (internal citations omitted) (emphasis added).

The case of *Knox v. Delta Int'l Mach. Corp.*, 554 So.2d 6 (Fla. 3rd DCA 1989) is instructive on this point.

There, the plaintiff was injured, losing two of his fingers, while using a jointer machine made by the defendant-manufacturer. *See id.* at 7. The jointer machine was designed and manufactured with a safety guard, and was, without genuine dispute, reasonably safe for consumer use so long as the safety guard remained on the machine. *See id.* Nevertheless, at the time of the accident, the safety guard was detached from the machine. *See id.* Finding that the trial court properly entered summary judgment in favor of the defendant-manufacturer in light of the removal of the safety guard, the appellate court held:

> The fact that the safety guard could be, and was in the instant case, detached from the machine, resulting in the loss of two of the plaintiff['s][ ] fingers, did not as urged, render the machine unreasonably dangerous so as to permit a jury finding to that effect. This is so because a manufacturer is, as a matter of law, under *no duty* to produce a fail-safe product, so long as the product poses no unreasonable dangers from consumer use. Producing an otherwise safe jointer machine with a detachable safety guard poses no such unreasonable dangers.

*Id.* (emphasis added).

Following *Knox*,[36] this Court finds that a bypass, if any, of the lift's safety devices does not render the Defendant liable in this instance. The Defendant is, as a matter of law, under *no duty* to produce a fail-safe product. To hold otherwise would require the Defendant to assume the role of an insurer; a manufacturer is not liable

---

**36.** Although the Florida Supreme Court has never directly considered the question presented in *Knox*, the law is clear that in diversity cases where a state supreme court has not addressed an issue, a federal court applying state law is bound to conform its decision to the appellate court's absent evidence indicating that the state supreme court would decide otherwise. *See Media Servs. Group, Inc. v. Bay Cities Communications, Inc.*, 237 F.3d 1326, 1329 n. 5 (11th Cir.2001); *see also CSX* *Transp., Inc. v. Trism Specialized Carriers, Inc.*, 182 F.3d 788, 790–92 (11th Cir.1999); *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.*, 710 F.2d 678, 690 (11th Cir.1983). This is the case even if a federal court does not agree with the state court's reasoning or the outcome dictated. *See Silverberg*, 710 F.2d at 690. In this instance, there is no indication that the Florida Supreme Court would reach a conclusion opposite of that reached in *Knox*.

for all accidents involving its product.[37]

### D. There is no Evidence of Negligence on the Part of Trak International

Assuming for purposes of argument, that there was no misuse or alteration, the Court alternatively finds that Trak International is not liable because there is no evidence in the record indicating negligent design, manufacturing, or construction with respect to the Lull 844C–42 Telescopic Handler. For a rough terrain forklift to be useful, it must allow for the operator to both tilt the frame and raise a boom. As a result, those features do not, per se, indicate negligence.

In any event, even if Trak International were negligent, there is no evidence indicating that such negligence caused the decedent's injury. Instead, it is apparent that the decedent's misuse of the lift as a personnel carrier was the sole legal cause of his injuries. Accordingly, the Defendant, Trak International, is entitled to summary judgment on the Plaintiff's negligent design, manufacturing, and construction claims.

### E. Workers' Compensation Immunity Protects Rental Service From Liability Predicated on Operator Error

■ The Defendant, Rental Service, next asserts that it is entitled to summary

judgment on the ground that the Plaintiff's claims are barred by workers' compensation immunity. *See* Doc. No. 75 at 7–9. According to the Defendant, since the person who operated the lift at the time of the accident did so under the direction of Collis, the Lull 844C–42 Telescopic Handler effectively became the working tool of Collis *See id.* at 7. Thus, says the Defendant, the Plaintiff's recovery against Rental Service should be limited to "no more recovery than [that] permitted by the workers' compensation statutes." *Id.* (internal citations omitted).

The most relevant case discussing the availability of the defense of workers' compensation immunity to a lessor of machinery is *Litton v. Saf–T–Green of Orlando, Inc.*, 608 So.2d 908 (Fla. 5th DCA 1992), *rev. denied,* 617 So.2d 320 (Fla.1993). In *Litton,* a lessor of aerial platforms was sued by a renter's employee for personal injuries arising out of the operation of a platform. *See id.* at 908. With respect to the defense of workers' compensation immunity, the Court stated:

> [W]as the cause of the accident a defect or other problem with the machinery or was it operator error? Under the former, [the lessor] would be liable to the employee; under the latter, [the lessor] would enjoy worker's compensation immunity.

---

**37.** The Court additionally notes that the Plaintiff's claim regarding the proximity switches fails because in a product liability action sounding in strict liability or negligence, a plaintiff must demonstrate that the cause of the injuries was a defective product whose defect existed at the time in which the product left the manufacturer's control. *See Rodriguez v. Nat'l Detroit, Inc.*, 857 So.2d 199, 201 (Fla. 3rd DCA 2003). Thus, if the evidence establishes that the proximity switches on the Lull 844C–42 Telescopic Handler were bypassed—a material and substantial alteration from the condition in which the lift left the manufacturer's con-

trol—and that the alteration caused the lift to tip over, no recovery can be had. *See id.* at 201. A manufacturer is not responsible for accidents occurring on account of substantial and material alterations taking place subsequent to the release of a product into the stream of commerce. *See id.* (affirming grant of summary judgment in products liability action brought under theory of negligence where evidence established that product was materially and substantially altered and/or changed from the condition in which Defendant originally manufactured and sold product, and where evidence established that alterations and changes caused the accident).

*Id.* at 910; *see also Larzelere v. Employers Ins. of Wausau,* 613 So.2d 510, 511 (Fla. 2nd DCA 1993), *rev. denied,* 624 So.2d 267 (Fla.1993).

The rationale for this rule is that under the latter scenario, the accident occurred as a result of a dangerous instrumentality in the control of the employer. *See Halifax Paving, Inc. v. Scott & Jobalia Constr. Co., Inc.,* 565 So.2d 1346, 1348 (Fla.1990). In such a situation, any negligence associated with the operation of the dangerous instrumentality is attributable to the employer; it is responsible for its own workplace tools. *See id.* at 1348. As a consequence, "the exclusivity principle of worker's compensation comes to bear." *See id.* at 1347 (citing Fla. Stat. § 440.11).

At the time of the accident here, the Lull 844C–42 Telescopic Handler was unquestionably the workplace tool of Collis. When Mr. Ignacio fell, the workplace, the lift, and its operator—a fellow employee of the decedent—were all under the sole direction and control of Collis. As such, any negligence associated with the operation of the lift, including, but not limited to, failing to properly train and/ or instruct the operator, is attributable to Collis. Even OSHA regulations recognize this principle:

(*l*) Operator training.

(1) Safe operation. (i) The employer *shall ensure* that each powered industrial truck operator is competent to operate a powered industrial truck safely, as demonstrated by the successful completion of [ ] training and evaluation . . .

(ii) Prior to permitting an employee to operate a powered industrial truck (except for training purposes), the employer *shall ensure* that each operator has successfully completed . . . training.

29 C.F.R. § 1910.178(*l*)(1) (2003) (emphasis added).[38]

In light of the foregoing, Rental Service is entitled to summary judgment on the Plaintiff's claim alleging negligence in "[f]ailing to insure that operators of the subject Lull 844C Telescopic Handler were appropriately trained and licensed to handle such machinery." Doc. No. 4, ¶ 22(e) at 5. *See Litton,* 608 So.2d at 910–11 (recognizing that a lessor is not liable for negligent operation of leased machinery on account of workers' compensation immunity); *Larzelere,* 613 So.2d at 511 (affirming grant of summary judgment in favor of defendant-lessor on issue of crane operator's negligence on account of workers' compensation immunity); *see also Clements v. Wildlife Conservation Soc'y,* 750 So.2d 715, 717 (Fla. 5th DCA 2000) (affirming grant of summary judgment in favor of defendant, a lessor of a crocodiles, in lawsuit arising out of an attack of an employee at an Alligator Farm because "[a]ll of the environment surrounding the tragedy was controlled solely by the Alligator Farm, to wit: the crocodile, the workplace and the injured employee" so that workers' compensation immunity applied).[39]

With respect to the Plaintiff's remaining claims against Rental Service—negligent

---

**38.** Section 1910.178 of the Code of Federal Regulations "contains safety requirements relating to fire protection, design, maintenance, and use of fork trucks, tractors, platform lift trucks, motorized hand trucks, and other specialized industrial trucks powered by electric motors or internal combustion engines." 29

C.F.R. § 1910.178(a)(1). The Lull 844C–42 Telescopic Handler falls within this purview.

**39.** As an alternative, the Court notes that the Plaintiff has failed to establish a duty on the part of a lessor to ensure that the employees

inspection, maintenance, and/or alteration in relation to the alleged bypass of the lift's proximity switches or in relation to a problem with the lift's boom and/or frame tilt function—this Court finds that the record contains insufficient evidence to establish a genuine issue of material fact.

The uncontroverted testimony of Mr. Templeton indicates that the proximity switches were functioning properly when the Lull 844C–42 Telescopic Handler was delivered from Rental Service to Collis.[40] Accordingly, it cannot be stated that Rental Service breached its duty of reasonable care by altering the proximity switches, and/or by failing to discover through its inspection and maintenance, that the proximity switches had been altered.

Likewise, the uncontroverted evidence indicates that the Lull 844C–42 Telescopic Handler's boom and frame tilt function

were working properly at all relevant times. In a deposition, the Plaintiff's expert admitted that prior to the accident there was no evidence indicating that the lift ever malfunctioned. *See id.* at pg. 115, lines 15–18. In fact, Mr. Templeton testified that when he operated the Lull 844C–42 Telescopic Handler on the day in question, it worked as intended. *See* Deposition of Roy Templeton (Doc. No. 60) at pg. 10, line 25 through pg. 11, line 5; and pg. 31, line 4 through pg. 32, line 6. Moreover, the lift was practically brand new at the time of the accident; it had been in operation for only 141 hours. *See* Deposition of Franklin H. Lever (Doc. No. 80) at pg. 40, lines 3–5; and pg. 89, line 14 through pg. 90, line 1. Thus, it cannot be stated that Rental Service breached a duty of reasonable care in failing to discover—through inspection and/or maintenance—a problem with the way the lift's boom or frame tilt

of its lessees are properly trained, licensed, and/or certified to operate leased equipment.

Legal "[d]uty is a question of law." *Gross v. Sand & Sea Homeowners Ass'n*, 756 So.2d 1073, 1075 (Fla. 4th DCA 2000) (internal citation omitted). It "may be derive[d] from several sources including: (1) legislative enactment and administrative regulation; (2) judicial precedent; and, (3) the specific facts of a given case." *Id.* (internal citation omitted). "The general facts of a case may indicate a legal duty where a defendant's conduct creates a foreseeable zone of risk." *Id.* (internal citation omitted).

This Court's research reflects no legislative enactment, administrative regulation, or judicial precedent imposing a duty on a lessor to ensure the training and/or certification of the employees of its lessees. Nor do the general facts of this case indicate a legal duty in that regard. Because all of the circumstances—the workplace, the lift, the lift's operator, and the decedent—surrounding the tip over of the Lull 844C–42 Telescopic Handler were controlled solely by Collis, only Collis' conduct logically contributed to a foreseeable zone of risk.

**40.** In his deposition, Mr. Templeton testified that prior to turning the lift over to Mr. Rojas, he elevated the boom angle of the Lull 844C–42 Telescopic Handler above forty degrees, and that as a result, the transmission locked. *See* Doc. No. 60 at pg. 46, lines 21–25; and pg. 57, lines 14–25 through pg. 58, lines 1–8. This establishes that the proximity switches were functioning properly at the time Rental Service delivered the lift to Mr. Templeton. *See* Plaintiff's Statement of Genuine Issues of Disputed Material Facts With Respect to Rental Service Corporation, Inc.'s Motion for Summary Judgment (Doc. No. 106), ¶¶ 45–46 at 7; *see also* Doc. No. 76, ¶¶ 9–10 at 3–4. Indeed, the Owner/Operator Manual indicates that:

When the boom angle is above 40 [degrees], the following conditions apply:
1. Rear axle cylinder locks, preventing the frame from rotating on the rear axle.
2. Transmission is disengaged.
3. Frame tilt function is disengaged.
Doc. No. 76, Ex. I at pg. 22.

function operates.[41]

### F. The Record Contains Sufficient Evidence Indicating That Mr. Ignacio Provided Support to His Survivors

■ The Florida Wrongful Death Act enumerates those individuals permitted to recover damages under the Act. In relevant part, it reads as follows:

'Survivors' means the decedent's spouse, children, parents, and, when partly or wholly dependent on the decedent for support or services, any blood relatives and adoptive brothers and sisters. It includes the child born out of wedlock of a mother, but not the child born out of wedlock of the father unless the father has recognized a responsibility for the child's support.

Fla. Stat. § 768.18(1).

With these principles in mind, the Plaintiff alleges that at the time of his death, Mr. Ignacio was survived by: (1) Maria Juvencia Ignacio, his mother and financial dependent; (2) Luz Viviana Valdivia Chavez, his daughter, born on September 5, 1998; (3) Luis Eduardo Losa, his son, born on June 27, 1994; and (4) Jose Angel Valdivia Chavez, his son, born on March 12, 1992. See Doc. No. 4, ¶ 3 at 1–2; see also Affidavit of Maria Juvencia Ignacio (Doc. No. 107), ¶¶ 2–3 at 1.

On summary judgment, the Defendant charges that the abovementioned survivors' claims should be denied because "[t]he Plaintiff has failed to provide any record evidence that Mr. Ignacio provided any type of financial support to his alleged survivors." Doc. No. 75 at 11 (emphasis omitted).

However, in an affidavit, Maria Juvencia Ignacio attests that on October 12, 2000, she, along with Luz Viviana Valdivia Chavez, Luis Eduardo Losa, and Jose Angel Valdivia Chavez, were "financially dependent on Felipe Ignacio." Affidavit of Maria Juvencia Ignacio (Doc. No. 107), ¶ 5 at 2. Insofar as Rental Service disputes Maria Juvencia Ignacio's sworn statements, there is a genuinely disputed issue of material fact.[42]

### G. Mr. Ignacio's Undocumented Alien Status Precludes An Award of Lost U.S. Wages

■ Rental Service's next argument on summary judgment challenges the Plaintiff's claim for lost wages. See Doc. No. 75

---

41. Although this Order grants the Defendants summary judgment on all of the Plaintiff's claims, in the interests of judicial economy, the Court will consider Rental Service's remaining arguments for judgment as a matter of law concerning the Plaintiff's claim for lost support and medical expenses.

42. In reaching this conclusion, the Court denies the Defendant's, Rental Service, Amended Motion to Strike the Affidavit of Maria Juvencia Ignacio (Doc. No. 116) on the ground that her attestations are in English and not in Spanish, her native tongue. Although it would have been more appropriate for Maria Juvencia Ignacio to sign a Spanish version of the affidavit and then for the plaintiff to translate the affidavit into English, the approach taken by the Plaintiff here—preparing an affidavit in English and thereafter orally translating it into Spanish for signature—does not render the affidavit per se improper. See Venzor v. Gonzalez, 968 F.Supp. 1258, 1262 n. 3 (N.D.Ill.1997) (denying motion to strike English affidavit of non-English speaking affiant even though it would have been preferable for the affiant to sign Spanish version that was then put into English). Since it is clear that Ms. Ignacio's affidavit was based on her personal knowledge, see Affidavit of Magaly Bennett (Doc. No. 123), the Court accepts her attestations for purposes of creating a genuine issue of material fact.

at 11–12. According to the Defendant, since Mr. Ignacio was not eligible for employment in the United States at the time of the accident in dispute, any claim predicated on lost wages must be dismissed as violating the United States' immigration laws. *See id.* To hold otherwise would be tantamount to sanctioning an illegal award, trivializing the immigration laws, and condoning and encouraging future violations. *See id.*

In 1986, Congress enacted the Immigration Reform and Control Act (hereinafter, "the IRCA"), 8 U.S.C. § 1324a, "a comprehensive scheme prohibiting the employment of illegal aliens in the United States." *See Hoffman Plastic Compounds, Inc. v. NLRB,* 535 U.S. 137, 147, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002). As a result, combating the employment of illegal aliens, is now "central to the [United States'] policy of immigration law." *Id.* (internal citations and quotations omitted).

The most important part of the IRCA is an extensive "employment verification system." *See id.* It requires employers to verify the identity and eligibility of all new hires by examining specified documents before they commence work. *See generally* § 1324a(b); *see also Hoffman,* 535 U.S. 137 at 148, 122 S.Ct. 1275. The specified documents include a "social security account number card", § 1324(a)(b)(C)(i), or any "other documentation evidencing authorization of employment in the United States which the Attorney General finds, by regulation, to be acceptable", § 1324a(b)(C)(ii).

If an alien applicant does not present the requisite documentation, he or she cannot be hired. *See* § 1324a(a)(1); *see also Hoffman,* 535 U.S. 137 at 148, 122 S.Ct. 1275. Along the same lines, if an employer unknowingly hires an unauthorized alien, and later discovers the workers' undocumented status, the employer is required to discharge the worker. *See* § 1324a(a)(2); *see also Hoffman,* 535 U.S. 137 at 148, 122 S.Ct. 1275.

Employers violating the IRCA's employment verification system are subject to civil fines, *see* § 1324a(e)(4)(A), and criminal prosecution, *see* § 1324(a)(f)(1). *See Hoffman,* 535 U.S. 137 at 148, 122 S.Ct. 1275. In addition, unauthorized aliens undermining or attempting to undermine the employer verification system are subject to fines and/or criminal prosecution. *See* § 1324c(a); *see also* 18 U.S.C. § 1546(b); *Hoffman,* 535 U.S. 137 at 148, 122 S.Ct. 1275. Specifically, undocumented aliens are prohibited from using or attempting to use "any forged, counterfeit, altered, or falsely made document" or "any document lawfully issued to or with respect to a person other than the possessor" for purposes of obtaining employment in the United States. *See* §§ 1324c(a)(1)-(3); *see also Hoffman,* 535 U.S. 137 at 148, 122 S.Ct. 1275.

In accordance with this framework, the United States Supreme Court has observed that "it is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies." *Hoffman,* 535 U.S. 137 at 148, 122 S.Ct. 1275. "Either the undocumented alien tenders fraudulent identification, which subverts the cornerstone of IRCA's enforcement mechanism, or the employer knowingly hires the undocumented alien in direct contradiction of its IRCA obligations." *Id.*

The record in this instance indicates that Mr. Ignacio unlawfully subverted the IRCA's enforcement mechanism by tendering fraudulent identification to obtain

employment. His Resident Alien Card and Social Security Card were not issued in his name but rather to "Felipe Baldivia." *See* Doc. No. 75, Ex. E. Moreover, it is apparent that the photo on the subject Resident Alien Card is not of the decedent. *See id.,* Ex. D & E. Finally, while the Resident Alien Card reflects a birth date of February 5, 1965, Mr. Ignacio's birth certificate indicates that he was born on February 5, 1964. *See id.,* Ex. E & F. It is also important to note that in his Memorandum in Opposition to the Defendant's Motion for Final Summary Judgment (Doc. No. 105), the Plaintiff does not dispute the claim that Mr. Ignacio was an undocumented alien unauthorized to work in the United States. *See* Doc. No. 105 at 16–18.

In *Hoffman Plastic Compounds, Inc. v. NLRB,* 535 U.S. 137, 151, 122 S.Ct. 1275 (2002), the United States Supreme Court concluded that the National Labor Relations Board (NLRB) could not award backpay to an undocumented alien who had been terminated in violation of the National Labor Relations Act (NLRA) because it "would unduly trench upon explicit statutory prohibitions critical to federal immigration policy", "encourage the successful evasion of apprehension by immigration authorities", "condone prior violations of the immigration laws", and "encourage future violations." *Id.* at 151, 122 S.Ct. 1275.

Following *Hoffman,* this Court finds that it cannot condone an award of lost wages here. In addition to trenching upon the immigration policy of the United States and condoning prior violations of immigration laws, awarding lost wages would be tantamount to violating the IRCA.

Indeed, if this Court were an employer, it would be compelled to discharge Mr. Ignacio. Otherwise, it would face civil fines and criminal prosecution for knowingly compensating an undocumented alien in exchange for work. Awarding lost wages is akin to compensating an employee for work to be performed. This Court cannot sanction such a result.

In reaching this conclusion, this Court rejects the Plaintiff's argument that because Florida extends workers' compensation benefits to undocumented aliens, lost wages should be extended here.

Florida law is well settled that workers' compensation benefits extend to undocumented aliens. *See Safeharbor Employer Servs. I, Inc. v. Velazquez,* 860 So.2d 984 (Fla. 1st DCA 2003); *Cenvill Dev. Corp. v. Candelo,* 478 So.2d 1168, 1170 (Fla. 1st DCA 1985); *see also Gene's Harvesting v. Rodriguez,* 421 So.2d 701 (Fla. 1st DCA 1982). In fact, the Florida Workers' Compensation Act defines the term employee as "any person who receives remuneration from an employer for the performance of any work or service ... whether *lawfully or unlawfully* employed" including, but not limited to, "*aliens*..." Fla. Stat. § 440.02(15)(a) (emphasis added).

However, as recognized by the First District Court of Appeal in *Safeharbor Employer Servs. I, Inc. v. Velazquez,* 860 So.2d 984, 986 (Fla. 1st DCA 2003), Florida workers' compensation benefits are significantly different from backpay. *See id.* at 986.

Workers' compensation constitutes a form of insurance; it protects against injuries occurring during the course of employment. In addition, "workers' compensation...supplants tort liability." *Employers Ins. of Wausau v. Abernathy,* 442 So.2d 953, 954 (Fla.1983). In exchange for a "swift and adequate means

of compensation" for work-place injuries it insulates "employers from potentially bankrupting tort liability." *Halifax Paving, Inc. v. Scott & Jobalia Constr. Co.,* 565 So.2d 1346, 1347 (Fla.1990). Finally, workers' compensation benefits reflect numerous policy considerations on the part of the Florida legislature—policy considerations that the legislature has obviously made in this instance. After all, if undocumented aliens were not included within the definition of employee for purposes of workers' compensation benefits, then they would be permitted to sue their employers in tort for work related injuries.

In the converse, lost wages constitute neither a type of insurance, nor a substitute for the Florida tort system. Nor do they reflect serious policy considerations on the part of the Florida legislature. Instead, they represent another remedy available to tort victims in addition to pain and suffering, medical expenses, funeral expenses, punitive damages, etc.

Thus, while awarding workers' compensation benefits is not inconsistent with the decision rendered in *Hoffman,* awarding lost wages is. Backpay and lost wages are nearly identical; both constitute an award for work never to be performed.

In sum, permitting an award predicated on wages that could not lawfully have been earned, and on a job obtained by utilizing fraudulent documents runs "contrary to both the letter and spirit of the IRCA, whose salutory purpose it would simultaneously undermine." *Majlinger v. Cassino Contracting Corp.,* 1 Misc.3d 659, 662, 766 N.Y.S.2d 332, 334 (N.Y.Sup.Ct. 2003) (dismissing claim for lost wages in negligence action predicated on work-related injury because plaintiff was unable to prove that he was legally authorized to work in the United States); *Hernandez–*

*Cortez v. Hernandez,* 2003 WL 22519678, *7, 2003 U.S. Dist. Lexis 19780, *19 (D.Kan. Nov. 4, 2003) (finding that plaintiff's status as an illegal alien precludes his recovery for lost income based on projected earnings in the United States); *but see Cano v. Mallory Mgmt.,* 195 Misc.2d 666, 669, 760 N.Y.S.2d 816 (N.Y.Sup.Ct. Apr.10, 2003) (holding that a plaintiff's undocumented alien status is not a bar recovery, but rather evidence that should be presented to the jury on the issue of lost wages); *Balbuena v. IDR Realty,* Index. No. 110868, 2000 (N.Y.Sup.Ct. May 21, 2003) ("Nothing in the [*Hoffman*] decision states, or even implies, that its holding would be applicable to tort actions brought under state common law"). "Manifestly, it is not within the power or competence of this court to encroach, even by indirection, upon the immigration policy of these United States." *Majlinger,* 1 Misc.3d 659, 663, 766 N.Y.S.2d 332, 334.

The undersigned therefor grants the Defendants summary judgment on the Plaintiff's claim for lost support insofar as it encompasses the lost wages Mr. Ignacio would have earned as an employee in the United States of America.

## H. The Lack of Evidence of Medical Expenses Precludes an Award in That Regard

Rental Service's final argument for summary judgment challenges the Plaintiff's claim for medical expenses on the ground that they are non-existent. *See* Doc. No. 75 at 13.

In the Complaint (Doc. No. 4), the Plaintiff requests medical expenses. Doc. No. 4, ¶¶ 24(c) and 30(c) at 5–6. However, the Plaintiff has failed to produce any documentary evidence that Mr. Ignacio's Es-

tate incurred such expenses. To the contrary, in an August 11, 2003 Supplemental Computation of Damages in Accordance with Fed.R.Civ.P. 26(a)(1)(C)[43], the Plaintiff states that he "is unaware of any medical damages at the present time." Doc. No. 75, Ex. G, ¶ 3 at 2; *see also* Doc. No. 105 at 16 n.1 ("Plaintiff stipulates Mr. Ignacio's estate has not incurred any medical expenses beyond those which might be assessed as a result of the emergent care that was provided on the day of the accident in an attempt to save Mr. Ignacio's life").

In light of this admission, the Court grants the Defendants summary judgment on the Plaintiff's claim for medical expenses.

## VI. CONCLUSION

Based on the foregoing, it is **OR-DERED** that:

1. The Defendant's, Trak International, August 29, 2003 Motion for Final Summary Judgment (Doc. No. 57) is **GRANT-ED.**

2. The Defendant's, Rental Service, September 8, 2003 Motion for Summary Judgment (Doc. No. 75) is **GRANTED.**

3. The Clerk shall enter a final judgment providing that the Plaintiff, David Veliz, as Personal Representative of the Estate of Felipe Valdivia Ignacio, shall take nothing on his claims against the Defendant, Rental Service. The judgment shall further provide that the Defendant,

Rental Service, shall recover its costs arising from this action.

4. The Clerk shall enter a final judgment providing that the Plaintiff, David Veliz, as Personal Representative of the Estate of Felipe Valdivia Ignacio, shall take nothing on his claims against the Defendant, Trak International. The judgment shall further provide that the Defendant, Trak International, shall recover its costs arising from this action.

5. The Clerk shall remove this case from the January 2004 trial calendar.

6. The Clerk shall close the file.

7. All other pending motions are denied as moot.

---

**43.** Rule 26(a)(1)(C) of the Federal Rules of Civil Procedure provides, in relevant part, as follows:

[A] party must, without awaiting a discovery request, provide to other parties:

[A] computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.